**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| PREMIUM TRANSPORTATION SERVICES, INC.,<br>d/b/a Total Transportation Services | ) | Case No. 16-10629 (KJC) |
| | ) | |
| | ) | |
| Debtor[1] | ) | |
| | ) | |

**PREMIUM TRANSPORTATION SERVICES, INC.'S MOTION FOR AN INTERIM AND FINAL ORDER AUTHORIZING, PURSUANT TO SECTIONS 105(a), 363(b), 503(b) AND 507(a) OF THE BANKRUPTCY CODE AND BANKRUPTCY RULES 6003 AND 6004, PAYMENT OF CERTAIN PRE-PETITION CLAIMS OF CRITICAL VENDORS**

Premium Transportation Services, Inc., d/b/a Total Transportation Services, the above-captioned debtor and debtor-in-possession (the "Debtor") hereby moves (the "Motion") pursuant to Sections 105(a), 363(b), 503(b) 507(a), 1107 and 1108 of title 11 of the United States Code (the "Bankruptcy Code") and Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") for entry of an interim order (the "Interim Order") and final order (the "Final Order" and, together with the Interim Order, the "Orders") (A) authorizing the Debtor, in its discretion, to (i) pay, in the ordinary course of business, certain undisputed prepetition obligations of vendors critical to the Debtor's operations; and (ii) continue during the postpetition period its prepetition practice with certain Critical Vendors, and (B) authorizing all banks and other financial institutions to honor and process related checks and transfers authorized pursuant to this Motion. In support of the Motion, the Debtor relies upon and incorporate by reference the *Declaration of Sam Joumblat in Support of First Day Relief* (the

---

[1] The Debtor in this chapter 11 case, along with the last four digits of the Debtor's federal tax identification number, is: Premium Transportation Services, Inc. (3417). The Debtor's corporate headquarters is located at 18735 South Ferris Place, Rancho Dominguez, California 90220.

"First Day Declaration"),[2] which was filed with the Court concurrently herewith. In further support of the Motion, the Debtor, by and through its undersigned proposed counsel, respectfully states as follows:

## JURISDICTION AND VENUE

1. The Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue of this proceeding and the Motion is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2. The statutory bases for the relief requested herein are sections 105(a), 363(b), 503(b) 507(a), 1107 and 1108 of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004.

3. The Debtor consents pursuant to Local Rule 9013-1(f) to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

## BACKGROUND

4. Debtor Premium Transportation Services, Inc., d/b/a Total Transportation Services, is a logistics provider with distinct expertise in distributing imports within the United States and Canada. The Debtor provides drayage, long distance haul and freight management services in California and Virginia and is one of the largest delivery carriers in Ports of Los Angeles and Long Beach—together, one of the busiest seaports in the world. While the Debtor utilizes independent owner-operator drivers ("Independent Operators"), who own or lease their

[2] Capitalized terms used but not defined herein have the meanings ascribed to them in the First Day Declaration.

own trucks and contract with the Debtor, to provide transportation services, the Debtor's Ontario, California division has some company-employed drivers, using trucks owned or leased and operated by the Debtor.

5. On March 13, 2016 (the "Petition Date"), the Debtor commenced its bankruptcy case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "Chapter 11 Case"). No trustee, examiner or creditors' committee has been appointed in this case. The Debtor is operating its business as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

6. A description of the Debtor's business and the reasons for filing the Chapter 11 Case is set forth in the First Day Declaration, filed contemporaneously herewith, and incorporated by reference as if fully set forth herein.

**The Critical Vendors**

7. Certain vendors (the "Critical Vendors") have claims for providing (i) essential goods to the Debtor that were received by the Debtor before the Petition Date, and/or (ii) essential services that were rendered to, or on behalf of, the Debtor before the Petition Date, (the "Critical Vendor Claims").

8. The essential goods and services provided by Debtor's Critical Vendors fall into several categories, including providers of equipment and fuel required for the Debtor's drivers to haul clients' freight, staffing services, truck maintenance and repair services, dispatch and transportation management software, marine terminal operators and shipping lines, third-party drayage and long-haul services, and other support services, such as coordination of electronic payments and disbursements in connection with the Debtor's drayage and freight management business.

9. For example, the Critical Vendor Claims include claims of certain third-party financial providers that provide fuel cards that are used by the Debtor's Independent Operators. The Debtor's business could not continue to function without the services provided and credit extended by such third-party financial providers because it is through such providers that the Independent Operators are able to efficiently obtain fuel. If such providers are not reimbursed for the amounts charged pre-petition on the fuel cards, and if the Debtor is not authorized to reimburse the providers for amounts it will pay going forward, such providers will no longer extend credit to the Debtor and the Debtor's drayage and long haul trucking business will grind to a stop. In general, the Debtor's fuel costs range from $70,000-$150,000 per week in the aggregate. The amount widely varies due to the volume of hauls in a particular week and the price of fuel.

10. In addition, in order to operate its business, the Debtor requires the use of chassis, upon which containers are placed to transport freight. Although the Debtor has some long-term leasing arrangements with chassis providers, the Debtor must also rent chassis from providers on a short-term basis. Since the Debtor (and the drivers that the Debtors contracts with or employs) cannot transport freight without the use of the chassis, and the providers of short-term chassis rentals are unlikely to provide the use of the chassis if there is any interruption or delay in the payment of the amounts due to them, it is crucial that the Debtor be authorized to pay any pre-petition amounts owed to such chassis providers.

11. The Debtor also pays per diem terminal demurrage fees to the appropriate parties to obtain access to the containers at the marine terminals at the Ports and to pick up freight for transportation. Since the Debtor cannot pick up freight from the Ports unless it has access to the containers at the Ports, which the Debtor will be denied if there is any interruption or delay in the

payment of the amounts due to the marine terminal operators, it is crucial that the Debtor be authorized to pay any pre-petition amounts owed to such terminal agencies. Similarly, the Debtor must sometimes pay per diem demurrage fees to shipping lines rather than a marine terminal operator. As provided above with respect to the marine terminals, the Debtor will be unable to pick up its freight from the shipping lines unless such fees are paid. Therefore, the Debtor must pay the Critical Vendor Claims of such terminal agencies and shipping lines to prevent an interruption in its business operations.

12. Additionally, the Debtor must continue to pay its dispatch and transportation management software providers. Without access to the dispatch and transportation software, the Debtor will not be able to effectively dispatch drivers, trace and bill the containers that are transported, bill customers and pay the drivers. Accordingly, it is crucial that the Debtor be authorized to pay pre-petition amounts owed to such providers.

13. By this Motion, the Debtor seeks entry of an order authorizing but not directing the Debtor to pay certain pre-petition claims of such Critical Vendors in an aggregate amount not to exceed \$2.5 million (the "Critical Vendor Cap"). By the Interim Order, the Debtor seeks the authority to pay only a portion of the Critical Vendor Cap, up to a maximum of \$1.5 million (the "Interim Cap"). The Debtor believes the amount requested under the Interim Cap is the minimum amount necessary to avoid the immediate harm that would result if no Critical Vendor Claims were able to be paid until the Final Hearing.

14. The Debtor believes that payment of the Critical Vendor Claims is vital to the operations of the Debtor's business, and necessary to maintain current operations and maximize value for the benefit of the estate.

15. In establishing the vendors that are truly critical, the Debtor reviewed its accounts payable to identify those vendors that are the most essential to the Debtor's continued operations using the following criteria: (a) whether the vendor is a "sole-source" provider, (b) whether the vendor is essential due to the logistical concerns that would materially hinder the Debtor from obtaining the goods or services from an alternate source, (c) whether certain customizations or other unique factors prevent the Debtor from obtaining a vendor's goods or services from alternative sources within a reasonable timeframe, (d) whether the Debtor has sufficient goods in inventory to continue operations while a replacement vendor is secured in the case of non-sole source providers, and (e) whether a vendor meeting the standards of (a), (b), (c) or (d) is likely to refuse to continue providing goods or services to the Debtor on a post-petition basis if its pre-petition balances are not paid.

16. After carefully assessing the universe of vendors against the foregoing criteria, the Debtor identified certain parties as Critical Vendors and estimated the total payments that would be necessary to ensure the continued supply of critical goods and services to the Debtor in calculating the Critical Vendor Cap, both on an interim and final basis.

17. When appropriate, in the Debtor's business judgment, the Debtor will seek to condition the payment of Critical Vendor Claims on the agreement of Critical Vendors to continue supplying goods and services on terms, and based on practices and programs in effect between the Critical Vendor and the Debtor in the six months prior to the Petition Date (the "Customary Trade Terms"), or such other trade terms as are agreed to by the Debtor and the Critical Vendor. The Debtor reserves the right to negotiate new trade terms with any Critical Vendor as a condition to payment of any Critical Vendor Claim.

18. Contemporaneously with the filing of this Motion, the Debtor has filed the *Debtor's Motion for Interim and Final Orders Pursuant to 11 U.S.C. §§ 361 and 363: (I) Authorizing the Debtor to Use Cash Collateral, (II) Scheduling a Final Hearing, and (III) Granting Related Relief*. If approved, the interim cash collateral order will allow the Debtor to utilize the cash generated in the ordinary course of the Debtor's business, which will provide ample liquidity for payment of the Critical Vendor Claims, as well as for the Debtor to conduct operations during the Chapter 11 Case and administer the Chapter 11 Case.

## RELIEF REQUESTED

19. The Debtor seeks entry of interim and final orders authorizing the Debtor, in its sole discretion, to (a) pay Critical Vendor Claims up to the Interim Cap on an interim basis and the Critical Vendor Cap on a final basis and (b) continue during the postpetition period its practices with the Critical Vendors.

20. Additionally, the Debtor seeks an order authorizing all banks and other financial institutions to receive, process, honor and pay any and all checks presented for payment and electronic transfers with respect to payments authorized by this Motion, whether presented before or after the Petition Date, upon receipt by each bank and financial institution of notice of such authorization, provided that sufficient funds are on deposit in the applicable accounts to cover such payments.

## BASIS FOR RELIEF

### I. Payment of the Critical Vendor Claims Is Warranted Under Section 363(b)(1) of the Bankruptcy Code

21. Section 363 of the Bankruptcy Code provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Under section 363(b) of the Bankruptcy

Code, courts require only that the debtor "show that a sound business purpose justifies such actions." *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) (internal citations omitted); *see also In re Phoenix Steel Corp.*, 82 B.R. 334, 335-36 (Bankr. D. Del. 1987); *In re Adeiphia Commc'ns Corp.*, No. 02-41729, 2003 WL 22316543, at *31 (Bankr. S.D.N.Y. Mar. 4, 2003); *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983). Moreover, "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) (citation omitted); *see also In re Tower Air, Inc.*, 416 F.3d 229, 238 (3d Cir. 2005) (stating that "[o]vercoming the presumptions of the business judgment rule on the merits is a near-Herculean task"). Courts have consistently and appropriately been loath to interfere with corporate decisions absent a showing of bad faith, self-interest, or gross negligence, and will uphold a board's decisions as long as they are attributable to any "rational business purpose." *See, e.g., Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)), appeal dismissed, 3 F.3d 49 (2d Cir. 1993).

22. As detailed above, maintaining the goods and services provided by the Critical Vendors is vital to the Debtor's continuing business operations and the success of this Chapter 11 Case. In addition, and as detailed above, the Debtor has concluded that there is a significant risk that the Critical Vendors will cease doing business with the Debtor unless the Critical Vendor Claims are paid. Should any Critical Vendor stop supplying goods, services, work or port access to the Debtor, or choose to significantly downgrade the Debtor's trade terms, the Debtor's business would be adversely affected as a result of, among other things, an adverse

impact on the Debtor's ability to meet the demands of its customers. As such, the Debtor submits that it has exhibited sound business judgment in identifying the Critical Vendors and the Critical Vendor Cap, and the amount of the Critical Vendor Cap pales in comparison to the likely damage to the Debtor's business and estate should the relief requested herein not be granted. In light of the foregoing, the Debtor submits that payment of the Critical Vendor Claims is plainly in the best interests of the Debtor's estate and creditors.

23. Material disruption to the Debtor's business that may result from nonpayment of the Critical Vendor Claims could threaten the Debtor's ability to consummate a restructuring. If the holders of the Critical Vendor Claims refuse to transact with the Debtor or limit credit or other trade terms the operations and continued viability of the Debtor's business will be jeopardized. In fact, the Critical Vendor Claims that the Debtor is requesting authority to pay are relatively small in comparison with the amount that the Debtor's stakeholders stand to lose if the Debtor's suppliers and service providers refuse to continue doing business with the Debtor in the ordinary course.

**II. Payment of the Critical Vendor Claims Is Warranted Under the Doctrine of Necessity**

24. Section 105(a) of the Bankruptcy Code, which codifies the inherent equitable powers of the bankruptcy court, empowers the bankruptcy court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." The Court may use its power under section 105(a) of the Bankruptcy Code to authorize payment of the Claims under the "necessity of payment" rule (also referred to as the "doctrine of necessity"). *In re NVR L.P.*, 147 B.R. 126,127-28 (Bankr. E.D. Va. 1992).

25. The United States Court of Appeals for the Third Circuit recognized the "necessity of payment" doctrine in *In re Lehigh & New England Railway Co.*, 657 F.2d 570, 581

(3d Cir. 1981). The Third Circuit held that a court could authorize the payment of prepetition claims if such payment was essential to the continued operation of the debtor. *Id.* (stating that court may authorize payment of prepetition claims when there "is the possibility that the creditor will employ an immediate economic sanction, failing such payment"); *see also In re Motor Coach Indus. Int'l, Inc.*, No. 08-12136 (BLS), 2009 WL 330993, at *3 (D. Del. Feb. 10, 2009) (denying stay pending appeal on grounds that there is no serious basis to challenge doctrine of necessity in Third Circuit); *In re Penn Cent. Transp. Co.*, 467 F.2d 100, 102 n.1 (3d Cir. 1972) (holding that necessity of payment doctrine permits "immediate payment of claims of creditors where those creditors will not supply services or material essential to the conduct of the business until their pre-reorganization claims have been paid"); *In re Just for Feet, Inc.*, 242 B.R. 821, 824-26 (Bankr. D. Del. 1999) (noting that Third Circuit permits debtors to pay prepetition claims that are essential to continued operation of business).

26. The necessity of payment doctrine is designed to foster a debtor's rehabilitation, which courts have recognized is "the paramount policy and goal of Chapter 11." *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 176 (Bankr. S.D.N.Y. 1989); *see also In re Adams Apple, Inc.*, 829 F.2d 1484, 1490 (9th Cir. 1987) (recognizing that allowance of "unequal treatment of pre-petition debts when necessary for rehabilitation" is appropriate); *In re Chateaugay Corp.*, 80 B.R. 279, 287 (S.D.N.Y. 1987) (authorizing payment of prepetition worker's compensation claims on grounds that the fundamental purpose of reorganization and equity powers of bankruptcy courts "is to create a flexible mechanism that will permit the greatest likelihood of survival of the debtor and payment of creditors in full or at least proportionately"); *Just for Feet*, 242 B.R. at 826 (finding that payment of prepetition claims to certain trade vendors was "essential to the survival of the debtor during the chapter 11 reorganization"); *In re Quality*

*Interiors, Inc.*, 127 B.R. 391, 396 (Bankr. N.D. Ohio 1991) ("[P]ayment by a debtor-in-possession of pre-petition claims outside of a confirmed plan of reorganization is generally prohibited by the Bankruptcy Code," but "[a] general practice has developed . . . where bankruptcy courts permit the payment of certain pre-petition claims, pursuant to 11 U.S.C. § 105, where the debtor will be unable to reorganize without such payment."); *In re Eagle-Picher Indus., Inc.*, 124 B.R. 1021, 1023 (Bankr. S.D. Ohio 1991) (approving payment of prepetition unsecured claims of tool makers as "necessary to avert a serious threat to the Chapter 11 process").

27. Payment of the Critical Vendor Claims is warranted under the doctrine of necessity. The goods and services the Critical Vendors provide to the Debtor are absolutely necessary for the Debtor to conduct its business in the ordinary course. The Debtor cannot rely on bringing a motion to the Court to compel a Critical Vendor to address potential holdups as its sole means of ensuring uninterrupted supply of goods and services. Having the authority to pay the Critical Vendor Claims will greatly help the Debtor ensure a smooth transition into chapter 11 and keep a clear path to consummate a restructuring. Accordingly, payment of the Critical Vendor Claims, subject to Critical Vendors performing their obligations in accordance with Customary Trade Terms, affords the Debtor the greatest likelihood of post-emergence success.

## III. Payment of the Critical Vendor Claims that Are Administrative Expense Claims Is Warranted

28. Although the Debtor has not determined the amount as of the Petition Date, certain of the Critical Vendor Claims may relate to goods delivered to the Debtor within 20 days of the Petition Date. Section 503(b)(9) of the Bankruptcy Code provides that such Critical Vendor Claims are administrative expense claims against the Debtor's estate. The Debtor, therefore, is required to pay such Critical Vendor Claims in full to confirm a plan of

reorganization. *See* 11 U.S.C. § 1129(a)(9)(A) (requiring payment in full of claims entitled to priority). Instead of paying such claims after confirmation of a plan, the Debtor seeks to pay such claims during the pendency of the Chapter 11 Case as and when due. The Debtor believes that this relief is in the best interest of the Debtor's estate and will prevent detrimental changes to trade terms, and as such preserve the Debtor's liquidity.

29. Courts in this district and elsewhere authorize the payment of prepetition claims under section 503(b)(9) of the Bankruptcy Code at the outset of a chapter 11 case. *See, e.g., In re Everyware Global, Inc.*, No. 15-10743 (LSS) (Bankr. D. Del. Apr. 9, 2015) (authorizing payment of section 503(b)(9) claims); *In re Sorenson Commc'ns, Inc.*, No. 14-10454 (BLS) (Bankr. D. Del. Mar. 4, 2014) (same); *In re Physiotherapy Holdings, Inc.*, No. 13-12965 (KG) (Bankr. D. Del. Dec. 6, 2013) (same); *In re GateHouse Media, Inc.*, No. 13-12503 (MFW) (Bankr. D. Del. Sept. 30, 2013) (same); *In re Dex One Corp.*, No. 13-10533 (KG) (Bankr. D. Del. Mar. 19, 2013) (same); *In re Amicus Wind Down Corp. (f/k/a Friendly Ice Cream Corp.)*, No. 11-13167 (KG) (Bankr. D. Del. Oct. 6, 2011) (same); *see also In re Hawker Beechcraft, Inc.*, No. 12-11873 (SMB) (Bankr. S.D.N.Y. May 30, 2012) (same).

## IV. Payment of Critical Vendor Claims Supported by Liens Is Warranted

30. Certain Critical Vendor Claims may be held by creditors that (a) provide shipping, warehousing, and logistics services; or (b) lease facilities or equipment to the Debtor. Some of these creditors that do not already have liens may assert liens in the future, or liens may have arisen in favor of these Critical Vendors, against certain of the Debtor's assets under certain state and federal laws.[3] Under section 363(e) of the Bankruptcy Code, certain creditors with

[3] For example, section 7-307 of the Uniform Commercial Code provides, in pertinent part, that a "carrier has a lien on the goods covered by a bill of lading or on the proceeds thereof in its possession for charges after the date of the carrier's receipt of the goods for storage or transportation, including demurrage and terminal

liens may be entitled to adequate protection of their liens, the enforcement of which may impose additional costs on the Debtor's estate. For these reasons and for the reasons previously stated regarding avoiding disruption to the Debtor's operations, the Debtor's payment of the claims supported by liens is an exercise of the Debtor's sound business judgment.

31. Courts in this district and elsewhere provide for the payment of claims supported by liens at the outset of a chapter 11 case. *See, e.g., In re Everyware Global, Inc.*, No. 15-10743 (LSS) (Bankr. D. Del. Apr. 9, 2015) (authorizing payment of claims supported by liens); *In re Sorenson Commc'ns, Inc.*, No. 14-10454 (BLS) (Bankr. D. Del. Mar. 4, 2014) (same); *In re Physiotherapy Holdings, Inc.*, No. 13-2965 (KG) (Bankr. D. Del. Dec. 6, 2013) (authorizing payment of claims supported by liens); *In re GateHouse Media, Inc.*, No. 13-12503 (MFW) (Bankr. D. Del. Sept. 30, 2013) (same); *In re Dex One Corp.*, No. 13-10533 (KG) (Bankr. D. Del. Mar. 19, 2013) (same); *In re Neb. Book Co.*, No. 11-12005 (PJW) (Bankr. D. Del. July 21, 2011) (same); *see also In re Hawker Beechcraft, Inc.*, No. 12-11873 (SMB) (Bankr. S.D.N.Y. May 30, 2012) (same).

**PROCESSING OF CHECKS AND ELECTRONIC FUND**
**TRANSFERS SHOULD BE AUTHORIZED**

32. If the requested interim order permitting use of cash collateral is approved, the Debtor will have sufficient funds to pay the Critical Vendor Claims in the ordinary course of business using such cash generated in the ordinary course of its business. Under the Debtor's existing cash management system, the Debtor has made arrangements to readily identify checks or wire transfer requests relating to the claims, as applicable. The Debtor believes there is minimal risk that checks or wire transfer requests that the Court has not authorized will be

charges, and for expenses necessary for preservation of the goods incident to their transportation or reasonably incurred in their sale pursuant to law." *See* U.C.C. § 7-307(a) (2005).

inadvertently made. Thus, the Debtor requests that the Court authorize all applicable financial institutions to receive, process, honor, and pay any and all checks or wire transfer requests in respect of the Critical Vendor Claims.

**THE REQUIREMENTS OF BANKRUPTCY RULE 6003 ARE SATISFIED**

33. Under Bankruptcy Rule 6003, the Court may grant relief regarding a motion to pay all or part of a prepetition claim within 21 days after the Petition Date if the relief is necessary to avoid immediate and irreparable harm. Immediate and irreparable harm exists where the absence of relief would impair a debtor's ability to reorganize or threaten the debtor's future as a going concern. *See In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 36 n.2 (Bankr. S.D.N.Y. 1990) (discussing the elements of "immediate and irreparable harm" in relation to Bankruptcy Rule 4001). Bankruptcy Rule 6003 does not condition relief on imminent or threatened harm to the estate alone. Rather, Bankruptcy Rule 6003 speaks of "immediate and irreparable harm" generally. Cf Fed. R. Bankr. P. 4001(b)(2), (c)(2) (referring to "irreparable harm to the estate") (emphasis added). Indeed, the "irreparable harm" standard is analogous to the traditional standards governing the issuance of preliminary injunctions. *See* 9 COLLIER ON BANKRUPTCY ¶ 4001.06[3] (discussing source of "irreparable harm" standard under Rule 4001(c)(2)). Courts routinely consider third-party interests when granting such relief. *See, e.g.*, *Capital Ventures int'l v. Argentina*, 443 F.3d 214, 223 n.7 (2d Cir. 2006).

34. The relief requested in this Motion is necessary to avoid immediate and irreparable harm to the Debtor and all parties in interest. If the Debtor is not authorized to pay Critical Vendor Claims, the Critical Vendors may refuse to provide trade materials and services impacting the Debtor's ability to service its customers. Further, absent the relief, some parties may refuse to continue to offer the Debtor trade terms. Such actions would cripple the Debtor's

operations and undermine customer confidence in the Debtor and its ability to manage operations effectively, thereby causing immediate and irreparable harm. The Critical Vendors are vital to the Debtor's operations and to ensuring the smooth implementation of a restructuring. Accordingly, payment of the Critical Vendor Claims is vital to ensure that the Debtor's operations are not disrupted at a critical juncture in its restructuring. Therefore, the Debtor respectfully submits that the requirements of Bankruptcy Rule 6003 are satisfied.

## SATISFACTION OF BANKRUPTCY RULES 6004(A) AND 6004(H)

35. To implement the foregoing successfully, the Debtor requests that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtor has established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

## RESERVATION OF RIGHTS

36. Nothing contained in this Motion or any actions taken by the Debtor pursuant to relief granted in the Order is intended or should be construed as: (a) an admission as to the validity of any particular claim against the Debtor; (b) a waiver of the Debtor's rights to dispute any particular claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion; (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) a waiver or limitation of the Debtor's rights under the Bankruptcy Code or any other applicable law; or (g) a concession by the Debtor that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to this Motion are valid, and the Debtor expressly reserves its rights to contest the extent, validity, or perfection or seek avoidance of all such liens. If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to

the validity of any particular claim or a waiver of the Debtor's rights to subsequently dispute such claim.

## NOTICE

37. The Debtor will provide notice of this Motion to: (a) the creditors listed on the Debtor's consolidated list of thirty largest unsecured creditors, as filed with the Debtor's chapter 11 petition; (b) the Debtors' prepetition senior secured lenders; and (c) the United States Trustee for the District of Delaware. As this Motion is seeking first day relief, notice of this Motion and any order entered hereon will be served on all parties required by Local Rule 9013-1(m). The Debtor respectfully submits that no further notice of this Motion is required.

## CONCLUSION

WHEREFORE the Debtor respectfully requests entry of an order, substantially similar to the proposed forms of order attached hereto, granting the relief requested here and such other relief the Court may deem proper.

Dated: March 14, 2016
Wilmington, Delaware

MORRIS, NICHOLS, ARSHT & TUNNELL, LLP

*/s/ Tamara K. Minott*

Robert J. Dehney (No. 3578)
Erin R. Fay (No. 5268)
Tamara K. Minott (No. 5643)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19899-1347
Telephone: (302) 658-9200
Facsimile: (302) 658-3989
rdehney@mnat.com
efay@mnat.com
tminott@mnat.com

*Proposed Attorneys for Debtor and*

*Debtor-in Possession*

9910059.5