## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| PREMIUM TRANSPORTATION SERVICES, INC., | ) | Case No. 16-10629 (KJC) |
| d/b/a Total Transportation Services, Inc., | ) | |
| | ) | |
| Debtor[1] | ) | |
| | ) | |

**MOTION OF PREMIUM TRANSPORTATION SERVICES, INC., FOR INTERIM AND FINAL ORDERS AUTHORIZING, BUT NOT DIRECTING, THE DEBTOR TO (I) PAY PREPETITION WAGES, SALARIES AND OTHER COMPENSATION, (II) PAY PREPETITION PAYROLL TAXES AND BENEFITS AND CONTINUE BENEFIT PROGRAMS IN THE ORDINARY COURSE, AND (III) DIRECT BANKS TO HONOR CHECKS FOR PAYMENT OF PREPETITION EMPLOYEE PAYMENT AND PROGRAM OBLIGATIONS**

Premium Transportation Services, Inc. d/b/a Total Transportation Services, Inc. (the "Debtor"), files this motion (the "Motion") to (i) pay prepetition wages, salaries, and other compensation, (ii) pay prepetition payroll taxes and benefits and continue benefit programs in the ordinary course, and (iii) direct banks to honor checks for payment or prepetition payment and program obligations. In support of this Motion, the Debtor incorporates by reference the *Declaration of Sam Joumblat in Support of First Day Motions* (the "First Day Declaration")[2] and respectfully represents as follows:

## JURISDICTION

1.      The Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012. This is a core proceeding within the meaning of

---

[1]   The Debtor in this chapter 11 case, along with the last four digits of the Debtor's federal tax identification number, is: Premium Transportation Services, Inc. (3417). The Debtor's corporate headquarters is located at 18735 South Ferris Place, Rancho Dominguez, California 90220.

[2]   Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the First Day Declaration.

28 U.S.C. § 157(b)(2).  Venue of this proceeding and the Motion is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The Debtor consents pursuant to Rule 9013-l(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3.      The bases for the relief requested in this Motion are sections 105(a), 362, 363, and 507(a)(4)-(5) of title 11 of the United States Code (the "Bankruptcy Code"), rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rule 9013-1(m) of the Local Rules.

## **BACKGROUND**

4.      Debtor Premium Transportation Services, Inc., d/b/a Total Transportation Services, is a logistics provider with distinct expertise in distributing imports within the United States and Canada.  The Debtor provides drayage and freight management services in California and Virginia and long distance haul and freight management services in and is one of the largest delivery carriers in Los Angeles and the Port of Long Beach—together, one of the busiest seaports in the world.

5.      On March 13, 2016 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtor continues to operate its business and manage its properties as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the

Bankruptcy Code. No trustee, examiner or statutory committee has been appointed in this chapter 11 case.

6.     The events leading up to the Petition Date and the facts and circumstances supporting the relief requested herein are set forth in the *First Day Declaration*, filed contemporaneously herewith and incorporated herein by reference.

**A.     Employee and Contract Worker Descriptions**

7.     As of the Petition Date, the Debtor employs or is responsible for funding the payroll obligations for approximately 96 people that provide services to the Debtor (the "Employees"). Approximately 22 of the Employees are employed directly by the Debtor, while the remaining 74 Employees are employed by non-debtor Traffic Sales Consulting, Inc. ("TSC"), but provide services solely to the Debtor. The Debtor also contracts with approximately 140 independent contractors (the "Independent Contractors") for transportation services.

**B.     Employee Compensation, Reimbursement, and Other Obligations**

8.     The Debtor provides certain wages, salaries, and other compensation to the Employees and other compensated individuals or entities (exclusive of the applicable deductions, and exclusions detailed below, the "Compensation").[3] Also, the Debtor provides certain allocations and/or reimbursements for expenses incurred while Employees perform their employment duties (the "Expense Reimbursement"). The Compensation and Expense Reimbursement, along with the Deductions (defined below), Payroll Taxes and other Withholdings (both defined below), and any related obligations and administrative expenses outlined or referenced in this Section B, are defined herein as the "Payment Obligations."

---

[3] For ease in summarizing the Debtors' payment obligations, this definition includes Independent Contractor and Board Member obligations, despite the fact that these individuals are not Employees of the Debtors.

**(i)**    *Compensation*

9.    The Debtor's next regularly-scheduled payroll run will occur this week on Friday, March 18, 2016.  The total amount that will be paid is approximately $131,000 (exclusive of payroll taxes).  For Employees employed by TSC, ADP, LLC ("ADP") processes the Debtor's payroll and makes payments to the Employees.  For Debtor-employed Employees, Avitus Group ("Avitus") processes the Debtor's payroll and makes payments to the Employees.  Generally, on Monday of each week, the Debtor provides ADP and Avitus with a file that provides the amounts that are to be paid to each individual Employee.  ADP and Avitus draw funds from the Debtor's bank accounts on Thursday and Friday, respectively, in preparation for funding payroll on Friday.  ADP and Avitus then fund payroll directly to the Employees.  The Debtor estimates that the prepetition accrued but unpaid portion of Compensation with regard to the Employees totals approximately $131,000, collectively.[4]

10.    The chart below summarizes the Employees (approximate counts) as of the Petition Date, broken down by compensation method (hourly or salaried) and frequency of payment:

| Type of Employee | Payment Frequency | Number of Employees |
|---|---|---|
| Hourly or Per Mile Debtor Employed | Paid Weekly | 22 |
| TSC Employees Salaried | Paid Weekly | 21 |
| TSC Employees Hourly | Paid Weekly | 54 |
|  | **TOTAL:** | **96** |

11.    All Employees are paid on Fridays for the prior one-week period.  The Debtor's average aggregate net compensation (i.e. exclusive of the applicable deductions and

---

[4] This calculation of unpaid Compensation includes payments owing on account of wages and salaries.  The calculation does not incorporate amounts for benefits, including health benefits and paid time off.  This calculation also does not include expense reimbursement amounts, which the Debtor does not consider compensation.

withholdings noted below) paid to Employees for wages and salaries is approximately $131,000. This amount may fluctuate depending on the need for the Employees paid on an hourly or per mile basis in connection with active company projects.

12.     *Payment of Independent Contractors*.    For the approximate 140 Independent Contractors, the Debtors pay approximately $280,000, in the aggregate, in compensation each week (i.e., an average of $2,000 per week per independent contractor).    The Independent Contractors are paid weekly each Friday.    As of the Petition Date, a total of approximately $280,000 in Independent Contractor compensation has accrued but remains unpaid.

13.     *Payment of Board Members*.    As of the Petition Date, a total of approximately $5,000 in Board Member compensation has accrued but remains unpaid.

**(ii)     *Prepetition Deductions and Payroll Tax Withholdings***

14.     For each applicable pay period, ADP or Avitus deducts certain amounts from the Employees' paychecks (collectively, the "Deductions"), including, without limitation: (i) pre-tax contributions to health care discussed below; (ii) other pre-tax and after-tax deductions payable pursuant to certain of the Employee benefit plans discussed below; and (iii) other miscellaneous deductions.    The Debtor estimates that Avitus and ADP withhold, on average, approximately $15,000 per month in Deductions from these Employees' paychecks, collectively.

15.     The Debtor is also required by law to (i) withhold certain amounts from Employees' wages on account of, among other things, federal, state, and local income taxes, Social Security, and Medicare taxes for remittance to the appropriate federal, state, or local taxing authorities; and (ii) make matching payments for Social Security and Medicare taxes and pay additional amounts, based upon a percentage of gross payroll, for state and federal unemployment insurance (the "Payroll Taxes").    Avitus and ADP perform the withholdings and forward the payments to appropriate parties.    ADP and Avitus also charge the Debtor and TSC

for unemployment and workers' compensation insurance as required by applicable law and charge the Debtor and TSC an administrative fee (the "Other Taxes and Fees" and together with the Payroll Taxes, the "Taxes and Fees").  The Debtor estimates that ADP or Avitus charge on average, approximately $47,629 per month in Taxes and Fees.  The Debtor is unaware of any outstanding Taxes and Fees.

16.    Avitus and ADP also withhold from Employee Compensation certain amounts for loan payments, garnishment, and child support or other similar orders (together with the Taxes and Fees, the "Withholdings").  Avitus and ADP withhold approximately $110 per month for those obligations.  As ADP and Avitus actually transmit the Withholdings, the Debtor is unaware of any Withholdings that have been withheld from Employee Compensation and not yet remitted to the applicable third party.

(iii)    *Expense Reimbursement*

17.    In the ordinary course of business, the Debtor provides the Employees with Expense Reimbursements to either prepay or reimburse those individuals for certain expenses incurred while performing their duties on the Debtor's behalf ("Reimbursable Expenses").  Reimbursable Expenses include payments for travel (including meals, lodging, automobile mileage, car rental, entertainment, and other travel-related business expenses), business supplies, relocation expenses, and other business-related expenses.  These Reimbursable Expenses are paid and reimbursed in two ways: (1) company credit cards, with bills approved and paid by the Debtor, or (2) through submission and approval of expense reports.  Employees are required to submit expense reports detailing their Reimbursable Expenses by the last working day of each calendar month.

18.    The Debtor estimates that it spends approximately $24,000 in Expense Reimbursement per month.  Based on the monthly average and taking into account certain

trailing expenses that the Debtor is aware of for recent periods, the Debtor estimates that, as of the Petition Date, approximately $25,000 Reimbursable Expenses are likely to be outstanding.

## C.    Employee Benefit Plans

19.    The Debtor also provides certain Employees (and their dependents) with access to a variety of benefits programs.   These programs (collectively, the "Employee Programs," together with any related Employee Program obligations and the Payment Obligations, referred to herein as the "Payment and Program Obligations") include, but are not limited to: (i) medical, dental, and vision care insurance; (ii) flexible spending accounts; (iii) life, accidental death, and dismemberment insurance, disability insurance, and related supplemental insurance; (iv) COBRA medical coverage; (v) paid time-off benefits or sick leave; and (vi) 401(k) and similar retirement investment plans.   The Debtor estimates that, as of the Petition Date, the total amount owed or accrued in connection with the Employee Programs is approximately $43,800.[5]

### (i)    *Medical and Other Health Plans*

20.    The Debtor offers coverage to eligible Employees (and their dependents) for medical, dental, and other related benefits ("Health and Wellness Plans").   Employees become eligible to participate in these programs being employed by the Debtor for 30 days and TSC for 60 days.

21.    The Employees may choose from several medical, dental and vision plans, all of which are fully-insured.   TSC Employees may choose from several medical and dental plans through Aetna and a vision plan through VSP Vision.   The Debtor Employees may choose from two medical plans and a dental plan through HealthNet and a vision plan through EyeMed (all such medical, dental and visions plans collectively, the "Employee Medical Plans").

---

[5] This estimate excludes any accrued but unused vacation time.

22.     Employees pay a small portion of the overall cost of the Employee Medical Plans through deductibles, copays, and premiums (if the Employee selects dependent coverage) depending on what plan an Employee selects.  The Debtor withholds the premium deductions relating to the Employee Medical Plans from the insured Employee's Employee Compensation and remits them to the insurance provider.  The Debtor pays an average of $42,000 per month for the Employee Medical Plans.  As of the Petition Date, the Debtor estimates that approximately $42,000 is outstanding related to the Employee Medical Plans.

**(ii)     *Flexible Spending Accounts***

23.     Eligible Employees may elect to enroll in flexible spending accounts ("FSAs") for healthcare.  FSAs permit Employees to make pre-tax payroll contributions up to $2,500 per year for medical care expenses for Employees.  An Employee's gross pay is reduced by an amount equal to the Employee's contributions, as elected annually during the open enrollment period. Approximately 21 Employees currently have FSAs.  The Debtor does not pay any fees related to these accounts.

**(iii)    *Life, Accidental Death and Dismemberment and Disability Insurance***

24.     The Debtor and TSC provide basic life insurance and accidental death and dismemberment coverage ("Life and AD&D Insurance") and disability plans to eligible Employees (together, the "Disability Insurance Plans," and collectively with the Life and AD&D Insurance, the "Insurance Plans").  There are currently approximately 92 Employees enrolled in the Insurance Plans.  The Debtor pay on average $1,300 per month for the Insurance Plans.  As of the Petition Date, the Debtor estimates that approximately $1,300 is owed under the Insurance Plans.

25.     Eligible Employees may purchase supplemental personal insurance coverage to which the Debtor does not contribute ("Supplemental Insurance").  Participating Employees pay

all premiums in connection with the Supplemental Insurance through payroll withholding, which are then remitted to the appropriate provider.  The Debtor estimates that it or Avitus and ADP withhold approximately $500 per month in premiums and administrative costs in connection with the Supplemental Insurance.  The Debtor estimates that approximately $500 premiums and administrative costs in connection with the Supplemental Insurance is outstanding as of the Petition Date.

      **(iv)**    ***COBRA Medical and Dental Coverage***

26.     Former Employees are entitled to continue to participate in the Debtor's Medical Plan coverage pursuant to the Consolidated Omnibus Budget Reconciliation Act of 1986 (as amended, "COBRA") for up to 18 months post-employment (such coverage, the "COBRA Medical Coverage").  Failure to comply with the requirements of COBRA can subject the Debtor to monetary penalties, actions by the Department of Labor, and civil lawsuits by the former Employees to recover their benefits.  *See, e.g*., 29 C.F.R. § 2575.502c-6.

27.     The COBRA Medical Coverage is self-funded by the Debtor.  Former Employees who elect to participate in the COBRA Medical Coverage must pay a set amount, dependent on which type of plan they elect (i.e. family, individual, etc.), to a third-party benefit provider.  As of the Petition Date, approximately four former TSC employees are currently eligible to elect to participate in the COBRA Medical Coverage, as former Employees have 60 days following termination to make such election.  The Debtor does not presently have any former Employees with COBRA Medical Coverage.

      **(v)**    ***Paid Time-Off Benefits***

28.     TSC Employees have paid-time-off benefits, depending upon the Employee's length of employment (collectively the "PTO Benefits"). Employees directly employed by the Debtor do not have PTO Benefits, but are permitted 24 hours of sick leave following their 30th

day of employment.  This sick time is not paid out upon separation.  For Employees employed by TSC, the PTO Benefits accrue as follows:

| Length of Service After Probation | PTO Available |
| --- | --- |
| 0-11 months | 0 days |
| 12 months | 5 days |
| 24 months | 10 days |
| 60 months | 15 days |

29.     PTO Benefits are earned in equal and incremental amounts per month.  Accrued, unused PTO days may be carried over year to year up to a certain amount and are paid on voluntary termination.  TSC Employees have approximately 2,500 hours of accrued but unused PTO Benefits as of the Petition Date.

**(vi)     *Retirement Investment Plan***

30.     The Debtor maintains a 401(k) plan (the "401(k) Plan") for the benefit of certain eligible Employees and former Employees.  Employees may elect to participate in the 401(k) Plan after completing a year of employment with the Debtor.  The Debtor does not fund matching percentages into the 401(k) Plan or pay fees to Voya.  The 401(k) Plan is administered by Voya.

**RELIEF REQUESTED**

31.     To preserve the value of the Debtor's business as well as to prevent the disruption the business will suffer if prepetition employment-related obligations are not paid when due or as expected, as well as to maintain morale of the Debtor's workforce during this critical time, the Debtor requests entry of an interim order (the "Interim Order), pending entry of a final order or

the Interim Order becoming a final order (the "Final Order"), (i) authorizing, but not directing, the Debtor to pay the prepetition Payment and Program Obligations pursuant to sections 105(a), 363(b)(1), and 363(c)(1) of the Bankruptcy Code, up to the priority expense limit imposed on employee claims under Sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code, where applicable; (ii) authorizing, but not directing, the Debtor to continue paying the Payment and Program Obligations in the ordinary course of business; (iii) authorizing, but not directing, the Debtor to continue to offer, honor, and facilitate the Employee Programs in the ordinary course of business during the pendency of these chapter 11 cases; (iv) authorizing, but not directing, the Debtor to reissue checks, wire transfers, automated clearing house payments, electronic payments, or other similar methods of payment for such payments where such method of payment has been dishonored postpetition; (v) directing all banks to honor the Debtor's prepetition and postpetition checks, wire transfers, automated clearing house payments, electronic payments, or other similar methods of payment for payment of the Payment and Program Obligations; and (vi) scheduling a final hearing for the purpose of entering a Final Order regarding the relief requested herein.

## BASIS FOR RELIEF

32.    It is essential that the Debtor continues to honor its Payment and Program Obligations to ensure the continued operation of the Debtor's business and to maintain the morale of its workforce.  The Debtor faces the imminent risk that operations may be severely impaired if it is not immediately granted authority to continue to honor the obligations described in this Motion.  Further, absent the requested relief, many of the employees and independent contractors may be unable to meet personal obligations, may be left without medical insurance, or may seek alternative employment opportunities.  Honoring the Payment and Program

Obligations will, therefore, minimize the level of disruption and preserve the employee loyalty necessary to maintain the Debtor's operations during this bankruptcy case.

**A.      Payment of the Payment and Program Obligations is Appropriate Under Section 507 of the Bankruptcy Code**

33.      Pursuant to Sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code, certain claims for compensation are accorded priority in payment in an amount not to exceed $12,475 for each employee (to the extent such amounts accrued within 180 days of the petition date). 11 U.S.C. § 507(a)(4)-(5).   As of the Petition Date, all of the Debtor's Employees and Independent Contractors are owed compensation amounts within the statutory priority cap of Sections 507(a)(4) and 507(a)(5).   Thus, granting the relief requested is consistent with the Bankruptcy Code's purpose of ensuring that employees are paid in full up to the statutorily imposed limit due to the priority status of their claims.

**B.      Payment of the Payment and Program Obligations is Appropriate Under Section 363 of the Bankruptcy Code**

34.      Section 363 of the Bankruptcy Code empowers the bankruptcy court to authorize a chapter 11 debtor to expend funds in the bankruptcy court's discretion outside the ordinary course of business.   11 U.S.C. § 363.   Section 363(b)(1) provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  In order to obtain approval for the use of estate assets outside the ordinary course of business, a debtor must articulate a valid business justification for the requested use.  *See In re Filene's Basement*, No. 11-13511, 2014 WL 1713416, *12 (Bankr. D. Del. Apr. 29, 2014) (noting that under Section 363(b), "'[w]here the debtor articulates a reasonable basis for its business decisions . . . courts will generally not entertain objections to the debtor's conduct'") (quoting *In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986)); *In re Landsource Communities Development LLC*, No. 108BK11111, 2009 WL

4874670, ¶ 15 (Bankr. D. Del. Nov. 25, 2009) ("Where valid business justification exists, a presumption exists 'that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company.'") (quoting *In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1990)); *U.S. Trustee v. Bethlehem Steel Corp. (In re Bethlehem Steel Corp.)*, No. 02 Civ. 2954, 2003 WL 21738964, at *12 (S.D.N.Y. July 28, 2003) ("To approve a transaction under §363(b), the Bankruptcy Court must find that there is a good business reason to allow the transaction"); *In re Global Crossing Ltd.*, 295 B.R. 726, 743 (Bankr. S.D.N.Y. 2003) ("[A] § 363 application requires a showing that there is a 'good business reason to grant such an application.'") (quoting *Comm. Of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983)).

35.    Payment of the Payment and Program Obligations, as set forth herein, serves the sound business purpose of maintaining the Debtor's business operations and maximizing the value of the Debtor's estates.  Non-payment of the Payment and Program Obligations would jeopardize the Debtor's success in this cases, as such success hinges in large part on the morale and continued efforts and dedication of their employees and other compensated individuals and entities.  Accordingly, the Court should grant the requested relief under Section 363 of the Bankruptcy Code.

## C.    Payment of the Payment and Program Obligations is Appropriate in the Debtor's Management of Its Business Operations Under Sections 1107 and 1108 of the Bankruptcy Code

36.    In conducting business as debtors-in-possession under Sections 1107(a) and 1108 of the Bankruptcy Code, the Debtor is a fiduciary required to "act in the best interest of the estate as whole, including its creditors, equity interest holders, and other parties in interest." *LaSelle Nat. Bank v. Perelman*, 82 F.Supp.2d 279, 292 (D. Del. 2000).  These fiduciary duties require

"the debtor [to] maximize the value of the assets for payment of unsecured creditors." *In re High Strength Steel, Inc.*, 269 B.R. 560, 569 (Bankr. D. Del. 2001).

37.    Courts have noted that there are instances in which a debtor-in-possession can fulfill its fiduciary duty "only . . . by the preplan satisfaction of a pre-petition claim." *In re CoServ*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002); *see also In re Nellson Nutraceutical, Inc.*, 369 B.R. 787, 796 (Bankr. D. Del. 2007) (allowing debtors to continue their respective business). The *CoServ* court specifically noted that preplan satisfaction of pre-petition claims would be a valid exercise of a debtor's fiduciary duty when the payment "is the only means to effect a substantial enhancement of the estate." *In re Coserv*, 273 B.R. at 497. The court provided a three-pronged test for determining whether a preplan payment on account of a prepetition claim was a valid exercise of a debtor's fiduciary duty:

> First, it must be critical that the debtor deal with the claimant. Second, unless it deals with the claimant, the debtor risks the probability of harm, or, alternatively, loss of economic advantage to the estate or the debtor's going concern value, which is disproportionate to the amount of the claimant's pre-petition claim. Third, there is no practical or legal alternative by which the debtor can deal with the claimant other than by payment of the claim.

*Id*. at 498.

38.    Payment of each aspect of the Payment and Program Obligations meets each element of the *Coserv* court's standard.  As described above, the Employees likely maintain priority claims against the Debtor for the Payment and Program Obligations.  In addition, and more importantly, any failure by the Debtor to pay the Payment and Program Obligations would pose a real and substantial risk of loss of critical services now performed by the Employees, Independent Contractors, and other compensated individuals and entities at a critical time for the Debtor and its business, as it would increase the chances that employees may leave the Debtor and seek other opportunities.  The potential harm and economic disadvantage that would result

from the failure to pay the Payment and Program Obligations is grossly disproportionate to the amount of any pre-petition claim that may be paid. The Debtor has determined that there exists no practical or legal alternative to payment of such obligations. Therefore, the Debtor can only meet its fiduciary duty as debtor-in-possession under Bankruptcy Code sections 1107(a) and 1108 by payment of the Payment and Program Obligations.

### D. The Court May Rely on the "Necessity of Payment" Doctrine and its General Equitable Powers to Grant this Motion

39.     The proposed payments of the Payment and Program Obligations should also be authorized under Section 105 of the Bankruptcy Code, which empowers this Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Section 105(a) operates "to facilitate the implementation of other Bankruptcy Code provisions," and in so doing it provides a "bankruptcy court with broad authority to exercise its equitable powers." *Ameriquest Mortgage Co. v. Nosek (In re Nosek)*, 544 F.3d 34, 43 (1st Cir. 2008) (internal citations omitted). These equitable powers are granted to effectuate the policies and goals of chapter 11 reorganization, which are to rehabilitate the debtor, *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 176-77 (Bankr. S.D.N.Y. 1989), and to "create a flexible mechanism that will permit the greatest likelihood of survival of the debtor and payment of creditors in full or at least proportionately." *Mich. Bureau of Workers' Disability Comp. v. Chateaugay Corp. (In re Chateaugay Corp.)*, 80 B.R. 279, 287 (S.D.N.Y. 1987); *see also In re Structurlite Plastics Corp.*, 86 B.R. 922, 932 (Bankr. S.D. Ohio 1988) (rejecting a bright line rule prohibiting payment of prepetition debts because it "may well be too inflexible to permit the effectuation of the rehabilitative purposes of the Code").

40.     Under the "doctrine of necessity" or "necessity of payment" rule, first articulated in *Miltenberger v. Logansport C. & S.W. R. Co.*, 106 U.S. 286 (1882), bankruptcy courts can

exercise these equitable powers "to authorize a debtor in a reorganization case to pay pre-petition claims where such payment is essential to the continued operation of the debtor." *Ionosphere Clubs*, 98 B.R. at 176; *see, e.g* ., *In re Lehigh & N. Eng. Ry. Co.*, 657 F.2d 570, 581 (3d Cir. 1981) ("[T]he 'necessity of payment' doctrine, as it has developed since its original enunciation in *Miltenberger*, teaches no more than, if payment of a claim which arose prior to reorganization is essential to the continued operation of the [debtor] during reorganization, payment maybe authorized even if it is made out of its corpus.") (citation omitted) (emphasis added); *In re LCI Holding Co., Inc.*, No. 12-13319, 2013 WL 1101111, *2 (Bankr. D. Del. Mar. 15, 2013) ("The [d]octrine of [n]ecessity does justify the [p]lans.  In a liquidating case such as this, the eligible employees' efforts are necessary to preserve the [d]ebtor's businesses."); *In re Just For Feet, Inc.*, 242 B.R. 821, 825-26 (D. Del. 1999) ("The necessity of payment doctrine recognizes that paying certain pre-petition claims may be necessary to realize the goal of chapter 11—a successful reorganization.").

41.     The United States Court of Appeals for the Third Circuit has recognized the applicability of the doctrine of necessity with respect to the payment of pre-petition claims if such payment was essential to the continued operation of the debtor.  *In re Lehigh & N. Eng. Ry. Co.*, 657 F.2d at 581 (stating a court may authorize the payment of pre-petition claims if such payment was essential to the continued operation of the debtor); *In re Penn Cent. Transp. Co.*, 467 F.2d 100, 102 n. 1 (3d Cir. 1972) (holding that necessity of payment doctrine permits "immediate payment of claims of creditors where those creditors will not supply services or material essential to the conduct of the business until their pre-organization claims shall have been paid."); *see also In re Motor Coach Indus. Int'l, Inc.*, No. 08-12136, 2009 WL 330993, at *3 (D. Del. Feb. 10, 2009) (denying stay of appeal on grounds that "the viability of the 'doctrine

of necessity' has not been brought into serious question by the courts in the Third Circuit"); *In re Just for Feet, Inc.*, 242 B.R. at 824-26 (noting that the Third Circuit permits debtors to pay pre-petition claims that are essential to the continued operation of business).

42. As payment of the Payment and Program Obligations is critical to the continued value and operation of the Debtor's business, application of this Court's section 105(a) powers and the doctrine of necessity is appropriate in this case.

**E.     This Court is Authorized to Approve Payment of the Payment and Program Obligations Early in the Debtor's Bankruptcy Case Pursuant to Rule 6003 of the Federal Rules of Bankruptcy Procedure**

43. Further, Bankruptcy Rule 6003 provides that this Court may grant relief early in a bankruptcy case to "use, sell, lease, or otherwise incur an obligation regarding property of the estate, including a motion to pay all or part of a claim that arose before the filing of the petition . . ." where such relief is "necessary to avoid immediate and irreparable harm." FED. R. BANKR. P. 6003. Thus, Rule 6003 specifically contemplates granting relief to honor prepetition claims where necessary to preserve the estate and a debtor's prospects for reorganization and provides guidance on whether such authority should be granted immediately or delayed. As set forth herein and in the First Day Declaration, the relief requested in this Motion is necessary to avoid immediate and irreparable harm to the Debtor and Debtor's estate—accordingly, immediate approval is appropriate.

**F.     Applicable Bankruptcy and Non-Bankruptcy Law Requires
        Payment and Continuation of Certain of the Payment and Program Obligations**

44. The Deductions and Withholdings principally represent employee earnings that governments (in the case of taxes), Employees (in the case of voluntarily withheld amounts), and judicial authorities (in the case of any involuntarily withheld amounts) have designated for deduction from Employees' paychecks. If the Debtor does not remit those amounts, the

Employees may face legal action, and the Debtor may be burdened by inquiries and disputes concerning their failure to submit legally required payments, which will undoubtedly affect employee performance and negatively impact the Debtor's reorganization efforts to the detriment of all parties in interest.

45.    The Debtor is required by law to make the Payroll Tax deductions. To the extent that the Debtor has collected any Payroll Tax withholdings from the Employees, such amounts may be held in trust for the benefit of the governmental authorities imposing the tax.  The Debtor's estate would have no equitable interest in such "trust fund" taxes and these amounts would not be property of the Debtor's estates. *See Beiger v. Internal Revenue Serv.*, 496 U.S. 53, 59 (1990) ("Because the debtor does not own an equitable interest in property he holds in trust for another, that interest is not 'property of the estate.'"); *In re Al Copeland Enter., Inc.*, 991 F.2d 233, 237 (5th Cir. 1993) (providing that the person who collects tax revenues holds them in trust for the benefit of the state); *DuCharmes & Co. v. Mich. (In re DuCharmes & Co.)*, 852 F.2d 194, 195-96 (6th Cir. 1988) (noting that "individual officials of an employer who fail to pay over [federal withholding] taxes that have been withheld are subject to personal liability").  The Payroll Tax withholdings are also likely entitled to priority status under section 507(a)(8).  *See* 11 U.S.C. § 507(a)(8).

**G.    Similar Relief Has Been Granted by Courts in This District**

46.    Numerous courts, including this Court, have permitted the payment of pre-petition compensation, benefit and expense reimbursement obligations on the first day or in the early stages of other chapter 11 bankruptcy cases. *See, e.g.*, *In re The Wet Seal, Inc.*, No. 15-10081 (Bankr. D. Del. Feb. 12, 2015); *In re RadioShack Corp.*, No. 15-10197 (Bankr. D. Del. Feb. 6, 2015); *In re Deb Stores Holding LLC*, No. 14-12676 (Bankr. D. Del. Dec. 5, 2014); *In re*

*Endeavour Operating Corp.*, No. 14-12308 (Bankr. D. Del. Nov. 7, 2014); *In re QCE Finance LLC*, No. 14-10543 (Bankr. D. Del. Apr. 9, 2014).

47.     As discussed above, payment of the Payment and Program Obligations is necessary to retain the skilled and motivated workforce necessary to operate the Debtor's business.  Accordingly, based on the foregoing, the Debtor submits that the requested relief is necessary and appropriate, is in the best interests of its estate and creditors, and should be granted in all respects.

### PAYMENT OF CHECKS ISSUED AND OTHER TRANSFERS MADE IN RESPECT OF THE PAYMENT AND PROGRAM OBLIGATIONS

48.     The Debtor pays the Payment and Program Obligations with funds drawn by checks (the "Checks") or by means of electronic fund transfers (the "Electronic Transfers"). Before the Petition Date, the Debtor sent certain parties Checks or Electronic Transfers on account of Payment and Program Obligations that may not have cleared as of the Petition Date.

49.     To the extent any Check or Electronic Transfer has not cleared as of the Petition Date, the Debtor requests that the Court authorize the banks, in the Debtor's sole discretion, to receive, process, honor, and pay the Checks or Electronic Transfers.  If any party has not received payment for amounts owed on account of any Payment and Program Obligations, the Debtor seeks authority to issue replacement Checks, re-issue Electronic Transfers, or otherwise make payments on account of Payment and Program Obligations from the Debtor new, postpetition bank accounts.  The Debtor represents that each of the Checks and Electronic Transfers can be readily identified as relating directly to the authorized payment of amounts owed on account of Payment and Program Obligations.  Accordingly, if the relief requested is granted, Checks and Electronic Transfers other than those relating to authorized payments will not be honored inadvertently.

## SATISFACTION OF BANKRUPTCY RULE 6003

50.     Bankruptcy Rule 6003 provides that to the extent relief is necessary to avoid immediate and irreparable harm, a bankruptcy court may approve a motion to "pay all or part of a claim that arose before the filing of the petition" prior to 21 days after the Petition Date.  FED. R. BANKR. P. 6003.  As described in further detail above, the Debtor cannot operate its business absent the full cooperation and engagement of its Employees and Independent Contractors, which requires continuation of the Payment and Program Obligations.  The Debtor submits that the relief requested in this Motion is necessary to avoid immediate and irreparable harm to the Debtor, as described herein, and that Bankruptcy Rule 6003 has been satisfied.

## WAIVER OF BANKRUPTCY RULE 6004(A) AND (H) REQUIREMENTS

51.     Because the relief requested herein is necessary to avoid immediate and irreparable harm, to the extent required for the immediate implementation of the relief requested herein, the Debtor seeks a waiver of (i) the notice requirements under Bankruptcy Rule 6004(a); and (ii) the stay of the order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

## RESERVATION OF RIGHTS

52.     Nothing contained herein is or should be construed as: (a) an admission as to the validity of any claim against the Debtor; (b) a waiver of the Debtor's right to dispute any claim on any grounds; (c) a promise to pay any claim; (d) an assumption or rejection of any executory contract or unexpired lease pursuant to Bankruptcy Code section 365; or (e) otherwise affect the Debtor's rights under Bankruptcy Code section 365 to assume or reject any executory contract with any party subject to this Order. If this Court grants the relief sought herein, any payments made pursuant to the Court's order are not intended and should not be construed as an admission to the validity of any claim or a waiver of the Debtor's rights to dispute such claim subsequently.

**NOTICE**

53.      Notice of the hearing on this Motion has been given to: (a) the creditors listed on the Debtor's list of thirty largest unsecured creditors, as filed with the Debtor's chapter 11 petition; (b) counsel for the Debtors' prepetition senior secured lenders, and (c) the United States Trustee for the District of Delaware.  As this Motion is seeking first day relief, notice of this Motion and any order entered hereon will be served on all parties required by Local Rule 9013-1(m).  The Debtor respectfully submits that no further notice of this Motion is required.

**CONCLUSION**

**WHEREFORE**, the Debtor respectfully requests that this Court enter an Interim Order (i) authorizing, but not directing, the Debtor to pay the prepetition Payment and Program Obligations pursuant to sections 105(a), 363(b)(1), and 363(c)(1) of the Bankruptcy Code, up to the priority expense limit imposed on employee claims under Sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code; (ii) authorizing, but not directing, the Debtor to continue paying the Payment and Program Obligations in the ordinary course of business; (iii) authorizing, but not directing, the Debtor to continue to offer, honor, and facilitate the Employee Programs in the ordinary course of business during the pendency of these chapter 11 cases; (iv) authorizing, but not directing, the Debtor to reissue checks, wire transfers, automated clearing house payments, electronic payments, or other similar methods of payment for such payments where such method of payment has been dishonored postpetition; (v) directing all banks to honor the Debtor's prepetition checks, wire transfers, automated clearing house payments, electronic payments, or other similar methods of payment for payment of Payment and Program Obligations; and (vi) scheduling a final hearing for the purpose of entering a Final Order regarding the relief requested herein.

Dated: March 14, 2016
      Wilmington, Delaware

MORRIS, NICHOLS, ARSHT & TUNNELL, LLP

*/s/ Erin R. Fay*
Robert J. Dehney (No. 3578)
Erin R. Fay (No. 5268)
Tamara K. Minott (No. 5643)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware  19899-1347
Telephone: (302) 658-9200
Facsimile: (302) 658-3989
rdehney@mnat.com
efay@mnat.com
tminott@mnat.com

*Proposed Attorneys for Debtor and*
*Debtor-in Possession*