**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| PREMIUM TRANSPORTATION SERVICES, INC., | ) | Case No. 16-10629 (KJC) |
| d/b/a Total Transportation Services, | ) | |
| | ) | |
| Debtor[1] | ) | |
| | ) | |

## DECLARATION OF SAM JOUMBLAT IN SUPPORT OF FIRST DAY MOTIONS

I, Sam Joumblat, hereby declare under penalty of perjury:

1.      I am the Chief Financial Officer of Premium Transportation Services, Inc., d/b/a Total Transportation Services, a company organized under the laws of Delaware (the "Debtor"). I have been the Debtor's Chief Financial Officer since January 4, 2016.  Prior to my role at the Debtor, I spent 11 years working for the City of Long Beach, the last eight of which I was Chief Financial Officer of the Port of Long Beach, and most recently as the Chief Financial Officer of the Southern California Regional Rail Authority (Metrolink).  I hold a Bachelor's degree in Mechanical Engineering from American University of Beirut, a Master of Business Administration in Finance & Accounting, a Master of Science in Mechanical Engineering and a Master of Science in Engineering Management, all from the University of Southern California.  I am also a California Certified Public Accountant.

2.      As the Debtor's Chief Financial Officer, I am generally familiar with the Debtor's day to day operations, business and financial affairs, and books and records.  Except as otherwise indicated herein, all facts set forth in this declaration (this "Declaration") are based on my personal knowledge of the Debtor's operations and finances, information gathered from my

---

[1]   The Debtor in this chapter 11 case, along with the last four digits of the Debtor's federal tax identification number, is: Premium Transportation Services, Inc. (3417).  The Debtor's corporate headquarters is located at 18735 South Ferris Place, Rancho Dominguez, California 90220.

review of relevant documents, or information supplied to me by other members of the Debtor's management and the Debtor's advisors. I am over the age of 18 and am authorized to submit this Declaration on behalf of the Debtor. If called upon to testify, I could and would testify competently to the facts set forth herein.

3.      The Debtor has requested a variety of forms of relief in the initial "first day" motions and applications (collectively, the "First Day Motions") filed concurrently herewith to minimize the adverse effects of the commencement of this chapter 11 case on the Debtor's businesses. I am familiar with the contents of each of the First Day Motions and I believe that the relief sought in the First Day Motions is necessary to permit an effective transition into chapter 11. I further believe that the relief requested in the First Day Motions will preserve and maximize the value of the Debtor's estates and assist the Debtor in achieving an expeditious, successful reorganization.

4.      As further detailed below, the filing of this case is the result of several market-driven, industry, political, and legal headwinds that the Debtor has faced for some time now. The Debtor has attempted to mitigate each of these impediments, but has reached a point where the filing of the case was necessary to preserve the Debtor's value and assets.

5.      Part I of this Declaration describes the Debtor's history. Part II describes the Debtor's prepetition capital structure and indebtedness. Part III describes the circumstances leading to the commencement of this chapter 11 case. Part IV sets forth the relevant facts in support of each of the First Day Motions.

## PART I

### I.    Corporate History and Business.

6.    Total Transportation Services, Inc. ("TTSI"), the Debtor's predecessor-in-interest, was formed in 1989 in response to unmet airfreight market needs.  By the early 1990s, the company entered the truckload market and subsequently established its drayage operations in the late 1990s.  Today, the Debtor is a logistics provider with distinct expertise in distributing imports within the United States and Canada.  The Debtor provides drayage, long distance haul and freight management services from facilities in California and Virginia and is one of the largest delivery carriers in the Ports of Los Angeles and Long Beach— together one of the busiest seaports in the world.  The primary model for delivery of the Debtor's transportation services is independent owner-operator truck drivers ("Independent Operators"), although the Debtor's Ontario division has some company-employed drivers.  The Debtor's customers are engaged in a variety of industries and include companies such as Target, Lowes, Ross, UPS, FedEx, J. Crew, and Johnson & Johnson.  The chart attached hereto as Exhibit A illustrates the Debtor's corporate structure as of the Petition Date.

7.    As a result of mounting pressure from the International Brotherhood of Teamsters ("Teamsters") and litigation in the courts and before the California Division of Labor Enforcement Standards (DLSE), aka California Labor Commissioner, concerning the legal status of "independent contractor" drivers, in 2015, the Debtor entered into the Port Solutions Agreement ("PSA") following negotiations with the Teamsters.  The collaboration was facilitated by representatives of the Port of Los Angeles and the Office of the Mayor of Los Angeles.  Pursuant to the PSA, an affiliated entity – Eco Flow Transportation, LLC ("Eco Flow") – was formed in the Spring of 2015 to provide drayage services similar to the Debtor but through

Eco Flow employee drivers. The Debtor has been brokering work to Eco Flow for the past ten months or so, in exchange for a brokerage fee.

8.      The parent companies of the Debtor assessed further restructuring initiatives to diversify the portfolio's business. In general, this has resulted in the creation of certain additional subsidiary entities wholly-owned by the Debtor's parent company, Saybrook Logistics Acquisition, LLC ("Parent"), each with a new or specialized market focus. These affiliates are largely still in the early stages of operation or have not commenced operations as of the Petition Date. In addition, in connection with a corporate effort to simplify and more properly align the business operations of the Debtor and its various affiliates, the Debtor's predecessor-in-interest, TTSI, was merged with and into the Debtor, but the Debtor continues to do business as "Total Transportation Services." These restructuring efforts also resulted in the amendment of the Debtor's then soon to mature senior revolving debt facility, pursuant to which the Debtor's parent company became the borrower and the Debtor a guarantor. The Debtor was previously the sole borrower under the facility.

**II.     Employees and Independent Operators.**

9.      As of the Petition Date, the Debtor employs or is responsible for funding the payroll obligations for approximately 96 people that provide services to the Debtor (the "Employees"). Approximately 22 of the Employees are employed directly by the Debtor, while the remaining 74 Employees provide services solely to the Debtor but are employed by non-debtor affiliate Traffic Sales Consulting, Inc. The Debtor also contracts with approximately 140 Independent Operators for transportation services. As of the Petition Date, the Debtor is not a party to any collective bargaining agreements.

<u>**PART II**</u>

**I.      Prepetition Capital Structure.**

10.      As of the Petition Date, the Debtor's funded debt consists of (i) the Debtor's guarantee of a $4 million senior secured asset-based revolving facility with approximately $2 million in principal outstanding as of the Petition Date; and (ii) a secured $17,850,000 note with approximately $24 million in principal and interest outstanding as of the Petition Date, which note is subordinated to Debtor's guarantee of the Credit Agreement (as defined below).

11.      <u>The Revolving Credit Agreement, Assignment, Guarantee and Senior Security Agreement</u>: The Debtor has guaranteed the obligations of Parent under a $4,000,000.00 asset-based revolving credit facility pursuant to (a) that certain Credit Agreement dated May 12, 2014 (as amended or modified, the "<u>Credit Agreement</u>") by and among Parent, California United Bank (the "<u>Prepetition Senior Lender</u>") and Debtor; (b) that certain Assignment and Assumption Agreement, Amendment and Waiver, dated March 1, 2016 (the "<u>Assignment</u>"), by and among Parent, Prepetition Senior Lender and Debtor; and (c) that certain Continuing Guarantee, dated March 1, 2016 (the "<u>Guarantee</u>") by and among Debtor and Prepetition Senior Lender.  The obligations of the Debtor under the Guarantee are secured by substantially all of the assets of the Debtor, excluding the Debtor's truck fleet, as more fully described in the Third Party Security Agreement dated as of March 1, 2016 by and among Debtor and the Prepetition Senior Lender. The Assignment extended the maturity date of the Credit Agreement to June 15, 2017.  As noted above, as of the Petition Date, there is approximately $2 million in principal outstanding under the Credit Agreement.

12.      <u>The Note and Junior Security Agreement</u>: The Debtor is also party to that certain Second Amended and Restated Promissory Note, by and among Debtor (as successor by merger to TTSI) and TTSI Financing, LLC (the "<u>Prepetition Junior Lender</u>"), dated as of October 3,

2011 and restated July 15, 2014 (the "Note").  The Note is secured by substantially all of the assets of the Debtor as more fully described in that certain Security Agreement, dated October 3, 2011, by and among Debtor (as successor by merger to TTSI) and the Prepetition Junior Lender. The Note matures on October 3, 2017.  As of the Petition Date, there is approximately $24 million in principal and interest outstanding under the Note.

**II.     Equity Interests.**

13.     The Debtor is wholly owned by Saybrook Logistics Acquisition, LLC, which in turn is wholly owned by Port Solutions Holdings, LLC.

## PART III

### Events Leading to the Chapter 11 Case

**I.     Headwinds in the Drayage Business.**

14.     The Debtor's customers range from major retailers to small businesses.  All of the Debtor's customers, however, are cost sensitive, as an increase in shipping costs directly affects their bottom line and prices they must charge consumers.  The Debtor has experienced downward pricing pressure from some of its major clients over the last year.  At the same time, the Debtor's fixed and operating costs continue to rise.

15.     As further explained below, the Debtor's operational budget issues have been significantly exacerbated by litigation related to their Independent Operators.  The Debtor has incurred significant legal expense in defending claims brought by Independent Operators and making related settlement payments.

**II.     Organized Labor Efforts and the Driver Litigation.**

16.     The Debtor and most other licensed logistical motor carrier companies have historically used and continue to use Independent Operators to perform trucking services.  The Independent Operators perform the trucking services pursuant to regulations issued by California

6

state authorities and those issued by the Federal Motor Carrier Safety Administration, a division of the U.S. Department of Transportation.

17.     Prior to 2009, many independent operators, including the Independent Operators that contracted with the Debtor, owned their own trucks and used their own trucks to perform trucking services for the Debtor in the Ports of Los Angeles and Long Beach (the "Ports").  In 2008, the Board of Harbor Commissioners of the City of Los Angeles and the Port of Long Beach adopted a "Clean Trucks Program" designed to replace pollution-causing trucks with newer trucks that would emit fewer particulates.  Beginning in 2008 and 2009, only "clean trucks" that met the emissions requirements of the Clean Trucks Program were permitted to enter the Ports.

18.     Following the implementation of the Clean Trucks Program, very few of the Independent Operators performing services in the Ports were able to operate their existing trucks in the Ports because the trucks did not qualify as clean trucks under the Ports' Clean Trucks Program mandates.  To continue to have access to the Independent Operators' services, the Debtor and other trucking companies were compelled to intercede directly and either lease or purchase a number of trucks that complied with the new Clean Trucks Program requirements.

19.     As a result of the leasing relationship and Independent Operator agreements, beginning in mid-2012, there was increased scrutiny by the California Labor Commissioner's office concerning whether Independent Operators performing trucking services in the Ports were improperly classified as independent contractors.

20.     Much of the scrutiny resulting from the Teamsters increased efforts to organize the drivers performing drayage services in the Ports.  As part of the Teamsters organizing efforts, the Teamsters contended that many licensed motor carriers were misclassifying their

Independent Operators (and thus could be organized).  Many Independent Operators performing services for the Debtor filed wage claims with the California Labor Commissioner, alleging that the Debtor had violated various California wage laws resulting from the Independent Operators misclassification as independent contractors.  Other drayage industry carriers have faced similar claims and several have ceased doing business as a result of such claims and issues.  Throughout, the Debtor and other drayage industry carriers have taken the position that the adverse rulings by the Labor Commission amount to a retroactive change in interpretation of the law regarding independent contractor status.

21.     In addition to the wage claims filed by several Independent Operators with the California Labor Commissioner, other Independent Operators filed civil actions in Los Angeles County Superior Court alleging claims under the California Labor Code arising from their alleged misclassification as independent contractors.  The Debtor settled several of these administrative wage claims and civil actions.

22.     The wage claims by eleven (11) of the claimants proceeded to administrative hearings before the California Labor Commissioner in October 2015.  In March 2016, the Labor Commissioner ruled in favor of the claimants finding that the claimants were employees of the Debtor and not independent contractors.  The Labor Commissioner issued Orders, Decisions, and Awards in favor of these eleven (11) claimants and against the Debtor in an aggregate amount exceeding $1,115,000.   Recently, two new claimants filed wage claims with the Labor Commissioner against the Debtor alleging similar misclassification claims.  The administrative hearings on those two new wage claims are scheduled for May 2, 2016.

23.     Fourteen (14) individual claims proceeded to trial before the Los Angeles County Superior Court in November 2015.  In February 2016, the Court issued a proposed Statement of

Decision finding that the claimants were employees and proposing damages that the Debtor estimates to be between $2,220,000 and $2,800,000, plus undetermined amounts for reasonable costs and attorneys' fees. The Debtor filed timely objections to the proposed Statement of Decision. The Court has not yet ruled on the objections or issued a final judgment.

24.    Recently, three other plaintiffs filed a civil action in the Los Angeles County Superior Court alleging similar misclassification claims. The new civil action has not yet been scheduled for trial.

25.    As a result of the actions, the Debtor has incurred significant legal fees in excess of $4 million since 2014.

26.    To compound these issues, in October 2015, the California State Senate passed Senate Bill No. 588, a bill adopting a new law that establishes procedures for the California Labor Commissioner to enforce judgments against employers who fail to satisfy a final judgment against them for nonpayment of wages. The law may also extend liability from companies to owners and officers, in certain instances. Further, under the new law, if a final judgment against an employer for unpaid wages remains unsatisfied for 30 days after the time to appeal the judgment has expired and no appeal is pending, the *employer must cease business operations in the state unless the employer has obtained a surety bond to cover the value of the judgment. See* Cal. Lab. Code § 238.

27.    The enactment of this draconian law and the uncertainty of the breadth of its enforcement, in addition to the Debtor's mounting legal fees, the pending rulings, and the customer pricing demands described above, has proven more than the Debtor can manage. As a result, the Debtor determined that filing this case was necessary to provide a breathing space to stabilize operations and evaluate options for its business going forward.

## PART IV[2]

28.     The Debtor has or will file a number of First Day Motions seeking orders granting various forms of relief.  I believe the forms of relief requested are necessary to enable the Debtor to operate with minimal disruption during the pendency of the chapter 11 case and to permit the Debtor a breathing period to consider options.  I have reviewed each of the First Day Motions, including the exhibits thereto.  The Debtor believes, and I agree, that the Debtor has satisfied the applicable standards for the relief requested in each of the First Day Motions, and that the Court's grant of the requested relief is in the best interests of the Debtor's estate, its creditors, and all other parties in interest.  Accordingly, on behalf of the Debtor, I respectfully submit that the First Day Motions should be approved.  A description of the relief requested and the facts supporting each of the First Day Motions is set forth below.

### I.     Critical Vendor Motion.[3]

29.     **Relief Requested.**   The Debtor maintains relationships with several Critical Vendors that are essential to the ongoing operation of the Debtor's business.  Now that the Debtor is operating in chapter 11, I believe that the payment of Critical Vendor Claims is vital to the Debtor's continuing business operations.   Therefore, the Debtor seeks authority, in its discretion, to (i) pay, in the ordinary course of business, certain undisputed prepetition obligations of vendors critical to the Debtor's operations; and (ii) continue during the postpetition period its prepetition practice with certain Critical Vendors, and (B) authorizing all banks and other financial institutions to honor and process related checks and transfers

---

[2]     Capitalized terms in this Part IV of this Declaration, to the extent not defined herein, have the meanings ascribed to them in the applicable First Day Motions.

[3]     *See Premium Transportation Services, Inc.'s Motion for an Interim and Final Order Authorizing, Pursuant to Sections 105(a), 363(b), 503(b) and 507(a) of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004, Payment of Certain Pre-Petition Claims of Critical Vendors*, filed concurrently herewith.

authorized pursuant to the motion.  Additionally, the Debtor seeks that the order provide that the Debtor is authorized to condition payment of the Critical Vendor Claims on a Critical Vendor's maintenance or application of its Customary Trade Terms during the pendency of this chapter 11 case.

30.    **The Claims.**  The Critical Vendors provide the Debtor essential goods and services in the ordinary course of business including, among other things, equipment and fuel required for the Debtor's drivers to haul clients' freight, staffing services, truck maintenance and repair services, dispatch and transportation management software, terminal agencies and shipping lines, third-party drayage and long-haul services, and other support services, such as coordination of electronic payments and disbursements in connection with the Debtor's drayage and freight management business.

31.    The Debtor seeks authorization to pay certain pre-petition claims of such Critical Vendors in a total aggregate amount not to exceed $2.5 million.  By the Interim Order, the Debtor seeks the authority to pay only a portion of the Critical Vendor Cap, up to a maximum of $1.5 million (the "Interim Cap").  The Debtor believes the amount requested under the Interim Cap is the minimum amount necessary to avoid the immediate harm that would result if no Critical Vendor Claims were able to be paid until the Final Hearing.

32.    Payment of the Critical Vendor Claims is vital to the operations of the Debtor's business, and necessary to maintain current operations and maximize value for the benefit of the estate.  If the Debtor's drivers' access to fuel and integral equipment such as chassis, is interrupted or if the Debtor is forced to purchase or rent such goods at higher costs, assuming they can be efficiently obtained in the necessary geographic locations, it will likely slow or even stop the Debtor's operations and hinder its ability to meet customers' expectations.  Moreover,

certain of the Critical Vendors provide goods and services for which there are only a limited number of providers in the Debtor's geographic area. If such vendors refuse to continue to deal with the Debtor, the Debtor will be unable to continue to operate during the chapter 11 case.

## II.    Cash Management Motion.[4]

33.    **Relief Requested.** The Debtor seeks authority to continue to operate its Cash Management System in the day-to-day operation of their businesses, and to honor certain prepetition obligations in accordance with the operation of the Cash Management System. Specifically, the Debtor requests authority: (a) to continue to use, with the same account numbers, each of the Bank Accounts; (b) to treat the Debtor's existing Bank Accounts for all purposes as accounts of the Debtor as debtor in possession; and (c) to conduct banking transactions by all usual means and debit the Bank Accounts on account of all usual items and payment instructions.

34.    Additionally, the Debtor seeks authority: (i) to continue to use, in their present form, all existing Business Forms without reference to its "debtor in possession" status; (ii) to continue to use the Books and Records subsequent to the Petition Date rather than closing those and opening new books; and (iii) to continue and maintain its intercompany procedures and practices, in accordance with its ordinary course prepetition practice. The Debtor also requests authority for the Cash Management Bank to continue to service and administer the Bank Accounts as accounts of the Debtor as debtor in possession accounts without interruption and in the usual and ordinary course. Finally, the Debtor seeks a waiver of the Guidelines that require

---

[4]    *See Debtor's Motion for Interim and Final Orders Under Sections 105, 345, 363, 364, and 503(b) of the Bankruptcy Code, Bankruptcy Rules 6003 and 6004 and Local Rule 2015-2 Authorizing (I) Maintenance of Existing Bank Accounts; (II) Continued Use of Existing Business Forms and Records; (IV) Waiving the Requirements of Section 345(b) of the Bankruptcy Code on an Interim Basis; (V) Continuation of Intercompany Transactions and According Administrative Expense Status to Claims for Such Transactions and (VI) Related Relief,* filed concurrently herewith.

the Debtor to close the Bank Accounts and new postpetition bank accounts at approved depositories.

35.     The operation of the Debtor's business requires that the cash management system continue during the pendency of this chapter 11 case.  Requiring the Debtor to adopt a new, segmented cash management system at this early and critical stage of these cases would be expensive, would create unnecessary administrative problems, and would likely be much more disruptive than productive. Any such disruption could have an adverse impact upon the Debtor's ability to reorganize.

36.     **The Debtor's Bank Accounts and Existing Cash Management System.**  Prior to the commencement of this chapter 11 case, in the ordinary course of business, the Debtor maintained two Bank Accounts, specifically, an Operating Account and a Lockbox Account, at the Cash Management Bank.  Under the Cash Management System, the Debtor collects and concentrates the funds generated by the Debtor's operations to fund disbursements to its vendors, suppliers, employees and other creditors incurred in the operation of the Debtor's businesses. The Cash Management System uses Microsoft Dynamics GP, which is a general ledger system that tracks account balances and transfers.  In particular, the Debtor's finance and accounting employees use such platforms to accurately maintain and track the Debtor's cash and ensure payment of its obligations.

37.     **The Cash Management System.**  The majority of the Debtor's customers make payments to the Debtor by Automatic Clearing House (ACH) and Electronic Data Interchange (EDI).  Other customers send paper checks to an address that the bank uses to collect the checks, process them, and post to the debtor's Lock Box Account.  The Debtor receives from its customers on a daily basis.

38.     Disbursements made by the Debtor fall into five general categories: (i) payments made to vendors, suppliers and service providers, (ii) payments made to employees and independent owner operators, (iii) rental payments on facilities the Debtor leases or rents, (iv) lease payments on tractors and other equipment used by the Debtor to operate its business and (v) payments to marine terminals and shipping lines for demurrage charged on containers that exceed the free time allowed by the ports' tariff.   All five types of disbursements are subject to the Debtor's institutional controls.

39.     With respect to disbursements to vendors, suppliers and service providers, the Debtor has instituted a multi-step review and approval process to ensure that expenditures of the Debtor's funds are appropriately authorized.  In particular, invoices from vendors, suppliers and service providers are received by the Debtor at various locations.  Once received, invoices are reviewed and approved by the General Manager of the respective location and sent to the Debtor's finance department for a second level review by the Controller.  After an invoice is reviewed by the Debtor's finance department, it is entered into the Debtor's Microsoft Dynamics GP platform.  On a weekly basis, the Debtor generates a check report of all scheduled payments. This report is reviewed by the Debtor's Controller and Chief Financial Officer.  Only after this report is approved does the Debtor cut checks or issue ACH transfers.[5]  Only the Chief Financial Officer, the Chief Operations Officer and the Vice President of Operations are permitted to authorize the Cash Management Bank to electronically make payments, whether by check or ACH transfer.  All paper checks are on the Cash Management Bank's Safepay where the amount and payee information is transmitted to the Cash Management Bank for matching.

---

[5]     While the vast majority of the Debtor's disbursements are funded by check or ACH transfer, on occasion the Debtor makes disbursements by wire transfer.

14

40.     These checks or ACH transfers are issued from the Operating Account.  The Lockbox Account is a zero balance account used only to collect accounts receivable.  The Lockbox Account is swept each night up to the Operating Account.  The Debtor also receives and funds certain amounts for its affiliate, Eco Flow Transportation, LLC ("Eco Flow") through the Operating Account to Eco Flow's Operating Account.  As further described below, these transactions are journaled for Eco Flow.  The Debtor also occasionally funds or receives tax related payments from (or to) the Operating Account from an account held by its parent, Saybrook Logistics Acquisition, LLC.

41.     The Debtor funds payroll and other employment-related expenses for Traffic Sales Consulting, Inc. ("TSC"), which employs the majority of the Debtor's corporate-level employees.  The Debtor funds these amounts to an operating account held by TSC.  TSC uses a third-party payment administrator, ADP, Inc. ("ADP"), to administer all of its payroll and employment-related expenses.  ADP debits TSC's account for payroll payments and employee benefit payments.  ADP then disburses such funds from its own accounts to the employees, taxing authorities, and other applicable third parties.

42.     With respect to payroll for the employees housed at the Debtor, the Debtor uses a third-party payment administrator, Avitus Group ("Avitus"), to administer all of its payroll and employment-related expenses for company drivers.  Avitus debits the Operating Account for employee drivers' payroll and benefit expenses.  Avitus disburses such funds from its own accounts to the Debtor's employees, taxing authorities, and other applicable third parties.

43.     A Flexible Spending Account ("FSA") for employees is maintained by ADP for TSC employees.

44.     The cash management procedures utilized by the Debtor constitutes ordinary, usual, and essential business practices and are similar to those used by other businesses of similar size and complexity.

45.     **Cash Management Fees.**  In the ordinary course of business, the Debtor incurs fees charged by the Cash Management Bank for administering the Bank Accounts and certain credit card processing fees.  The administration of the Bank Accounts is a critical aspect of the Cash Management System, and any cessation of these services due to the Debtor's inability to pay the Cash Management Fees would be extremely disruptive to the Cash Management System and the Debtor' businesses overall.  As the Cash Management Fees are automatically debited from the Bank Accounts by the Cash Management Bank, if there were any outstanding Cash Management Fees on the Petition Date, the amount of such outstanding fees would be *de minimis*.  Therefore, the Debtor requests authority from the Court to pay and honor Cash Management Fees incurred in the ordinary course of the Debtor' business.

46.     **Existing Business Forms and Records.**  As part of the Cash Management System, the Debtor utilizes numerous preprinted business forms (the "Business Forms") in the ordinary course of its business.  The Debtor also maintains books and records to document, among other things, its profits and expenses.  To minimize expenses to its estate and avoid confusion on the part of employees, customers, vendors, and suppliers during the pendency of this chapter 11 case, the Debtor requests that the Court authorize its continued use of all correspondence and business forms (including, without limitation, letterhead, purchase orders, invoices, and preprinted checks) as such forms were in existence immediately before the Petition Date and thereafter, without reference to the Debtor's status as a "debtor in possession", rather

than requiring the Debtor to incur the expense and delay of ordering entirely new business forms as required under the U.S. Trustee Guidelines.

47.    **Intercompany Transactions.**  Prior to the Petition Date, the Debtor engaged in Intercompany Transactions, including, but not limited to, (i) paying expenses on behalf of non-debtor affiliates (for example, payment of employee expenses, vendors, legal fees, and insurance), and (ii) receiving payments for a non-debtor affiliate.  These expenses and payments are then allocated to the affiliates within the Debtor's accounting systems.  The Debtor charges one of its affiliates, Eco Flow, a 3% fee on received revenue for providing accounting functions to Eco Flow.

48.    Occasionally these transactions create intercompany balances, which are accounted for through book entries on the Books and Records.  The Cash Management System, in conjunction with the Debtor's accounting systems, allows for accurate tracking and tracing of such Intercompany Transactions.   To the extent there was a prepetition Intercompany Transaction in the ordinary course of a Debtor's business for which an affiliate is owed money, such affiliate would have a prepetition intercompany claim against the Debtor.  To the extent an affiliate makes a payment on one of the Debtor's behalf with respect to a postpetition obligation or there is an Intercompany Transaction in the ordinary course of the Debtor's business for which an affiliate is owed money, such affiliate would be afforded an administrative claim against the Debtor, pursuant to sections 364(b) and 503(b)(1) of the Bankruptcy Code.   If Postpetition Intercompany Claims are accorded such priority status, each entity utilizing funds flowing through the Cash Management System will continue to bear ultimate repayment responsibility for such borrowings.  Maintaining the Debtor's current procedures for accounting for Intercompany Transactions is warranted during the chapter 11 case.

17

49.     Accordingly, the Debtor requests authority to continue its prepetition practices with respect to Intercompany Transactions, subject to applicable provisions of any postpetition financing or cash collateral agreement or order, and further, to accord administrative expense status to obligations arising out of Postpetition Intercompany Claims, subject only to (a) liens and claims granted to the Debtor's senior secured lenders as adequate protection for use of cash collateral, and (b) any other claims granted administrative expense status pursuant to orders of this Court.

## III.    Wages and Benefits Motion[6]

50.     **Relief Requested.**  The Debtor seeks authority, but not direction, (a) to pay the prepetition Payment and Program Obligations, up to the priority expense limit imposed on employee claims under Sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code; (b) to continue paying the Payment and Program Obligations in the ordinary course of business; (c) to continue to offer, honor, and facilitate the Employee Programs in the ordinary course of business during the pendency of the chapter 11 case; and (d) to reissue checks, wire transfers, automated clearing house payments, electronic payments, or other similar methods of payment for such payments where such method of payment has been dishonored postpetition.  The Debtor further requests that the Court direct all banks to honor the Debtor's prepetition and postpetition checks, wire transfers, automated clearing house payments, electronic payments, or other similar methods of payment for payment of the Payment and Program Obligations.

51.     **Employees and Contract Workers.**  As of the Petition Date, the Debtor employs or is responsible for funding the payroll obligations for approximately 96 people that provide

---

[6]     *See Motion of Premium Transportation Services, Inc., for Interim and Final Orders Authorizing, But Not Directing, the Debtor to (I) Pay Prepetition Wages, Salaries and Other Compensation, (II) Pay Prepetition Payroll Taxes and Benefits and Continue Benefit Programs in the Ordinary Course, and (III) Direct Banks to Honor Checks for Payment of Prepetition Employee Payment and Program Obligations*, filed concurrently herewith.

services to the Debtor (the "<u>Employees</u>").  Approximately 22 of the Employees are employed directly by the Debtor, while the remaining 74 Employees are employed by non-debtor Traffic Sales Consulting, Inc. ("<u>TSC</u>"), but provide services solely to the Debtor.  The Debtor also contracts with approximately 140 independent contractors (the "<u>Independent Contractors</u>") for transportation services.

52.    The Debtor's next regularly-scheduled payroll run will occur this week on Friday, March 18, 2016.  The total amount that will be paid is approximately $131,000 (exclusive of payroll taxes).  For Employees employed by TSC, ADP, LLC ("<u>ADP</u>") processes the Debtor's payroll and makes payments to the Employees.  For Debtor-employed Employees, Avitus Group ("<u>Avitus</u>") processes the Debtor's payroll and makes payments to the Employees.  Generally, on Monday of each week, the Debtor provides ADP and Avitus with a file that provides the amounts that are to be paid to each individual Employee.  ADP and Avitus draw funds from the Debtor's bank accounts on Thursday and Friday, respectively, in preparation for funding payroll on Friday.  ADP and Avitus then fund payroll directly to the Employees.  The Debtor estimates that the prepetition accrued but unpaid portion of Compensation with regard to the Employees totals approximately $131,000, collectively.[7]

53.    For the approximate 140 Independent Contractors, the Debtor pays approximately $280,000, in the aggregate, in compensation each week (i.e., an average of $2,000 per week per independent contractor).  The Independent Contractors are paid weekly each Friday.  As of the Petition Date, a total of approximately $280,000 in Independent Contractor compensation has accrued but remains unpaid.

---

[7]    This calculation of unpaid Compensation includes payments owing on account of wages and salaries.  The calculation does not incorporate amounts for benefits, including health benefits and paid time off.  This calculation also does not include expense reimbursement amounts, which the Debtor does not consider compensation.

54.     As of the Petition Date, a total of approximately $5,000 in Board Member compensation has accrued but remains unpaid.

55.     In the ordinary course of business, the Debtor provides the Employees with Expense Reimbursements to either prepay or reimburse those individuals for certain expenses incurred while performing their duties on the Debtor's behalf ("Reimbursable Expenses"). Reimbursable Expenses include payments for travel (including meals, lodging, automobile mileage, car rental, entertainment, and other travel-related business expenses), business supplies, relocation expenses, and other business-related expenses.  The Debtor estimates that it spends approximately $24,000 in Expense Reimbursement per month.  Based on the monthly average and taking into account certain trailing expenses that the Debtor is aware of for recent periods, the Debtor estimates that, as of the Petition Date, approximately $25,000 Reimbursable Expenses are likely to be outstanding.

56.     In providing benefits to the Employees, the Debtor pays and incurs a number of obligations such as compensation, deductions and payroll taxes, incentive programs, expense reimbursement, relocation expenses, health benefits, workers' compensation benefits, paid time off, life insurance, accidental death and disability benefits, and other benefits, including employee contributions, claims and administrative fees to benefit providers, which the Debtor has historically provided and funded in the ordinary course of business. The Debtor estimates that, as of the Petition Date, the total amount owed or accrued in connection with the Employee Programs is approximately $43,800.[8]

57.     TSC Employees have PTO Benefits, depending upon the Employee's length of employment. Employees directly employed by the Debtor do not have PTO Benefits, but are

---

[8] This estimate excludes any accrued but unused vacation time.

permitted 24 hours of sick leave following their 30th day of employment. This sick time is not paid out upon separation. TSC Employees have approximately 2,500 hours of accrued but unused PTO Benefits as of the Petition Date.

58.     The Debtor seeks authority to pay Independent Contractors, fees to Board Members, and all Employee compensation-related obligations, including wages, salaries, expense reimbursements, benefit obligations, and related fees, deductions and withholdings, including payroll taxes as provided in the Wages and Benefits Motion.

59.     The Debtor also has various Employee programs and obligations that are administered or paid through third-party administrators, agents, consultants, or providers. The Debtor seeks authority to pay any prepetition fees of these third parties and to continue such payments post-petition in the ordinary course of their business, in order to insure the uninterrupted delivery of payments or other benefits to the Employees.

60.     I believe the vast majority of the Employees and Independent Contractors rely exclusively on their compensation to pay their daily living expenses. Both wages and the benefit programs discussed in further detail in the Wages and Benefits Motion are critical components of the Employees' total compensation package, and if the Debtor is not permitted to honor its outstanding Employee and Independent Contractor obligations, I believe many Employees and Independent Contractors will be exposed to significant financial difficulties.

61.     Moreover, if the Debtor is unable to satisfy such obligations, Employee and Independent Contractor morale will be jeopardized at a time when Employee and Independent Contractor support is critical. Any resulting loss in workforce could significantly hinder the Debtor's efforts to successfully reorganize. I further believe that any failure by the Debtor to pay the Payment and Program Obligations would pose a real and substantial risk of loss of critical

services now performed by the Employees, Independent Contractors, and other compensated individuals and entities at a critical time for the Debtor and its business, as it would increase the chances that employees may leave the Debtor and seek other opportunities.  The potential harm and economic disadvantage that would result from the failure to pay the Payment and Program Obligations is grossly disproportionate to the amount of any pre-petition claim that may be paid.

62.    As to the Deductions and Withholdings, if the Debtor does not remit those amounts, the Employees may face legal action, and the Debtor may be burdened by inquiries and disputes concerning their failure to submit legally required payments, which will undoubtedly affect employee performance and negatively impact the Debtor's reorganization efforts to the detriment of all parties in interest.

63.    I believe that the relief requested in the Wages and Benefits Motion is in the best interests of the Debtor's estate and will enable the Debtor to continue to operate its business during the chapter 11 case without disruption so as to avoid immediate and irreparable harm to Debtor's estate. Accordingly, I respectfully submit that the Wages and Benefits Motion should be approved.

## IV.    Cash Collateral Motion.[9]

64.    **Relief Requested.**  The Debtor is seeking entry of an interim order (the "Interim Order"): (i) authorizing its use of the Prepetition Secured Lenders' Cash Collateral, on an interim basis and (ii) scheduling a further interim hearing ("Interim Hearing") to consider the Debtor's use of the Prepetition Secured Lenders' Cash Collateral following the Termination Date and the

---

[9]    *See Premium Transportation Services, Inc.'s Motion for Interim Order Pursuant to 11 U.S.C. §§ 361 and 363: (I) Authorizing Use of Cash Collateral, (II) Granting Adequate Protection, (III) Scheduling Further Interim Hearing, and (IV) Granting Related Relief,* filed concurrently herewith.

entry of a final order authorizing the use of any Cash Collateral on a permanent basis as will be set forth in a subsequently proposed order.

65.    **Risk of Irreparable Harm and Need for Immediate Relief.**  The orderly continuation of the Debtor's operations and the preservation of its going concern value is largely dependent upon its ability to regularly convert Prepetition Collateral into Cash Collateral and use it to support the Debtor's business operations.  Among other things, Cash Collateral will be used to fund the Debtor's payments to vendors and employees and to satisfy ordinary costs of operation, including rent, taxes and insurance.  Without such access to liquidity, the Debtor's ability to navigate through the chapter 11 process will be jeopardized, to the detriment of the Prepetition Secured Lenders and all of the estate's other stakeholders.  As a result, the Debtor has an immediate need to use Cash Collateral to ensure sufficient liquidity throughout the pendency of this chapter 11 case.

66.    Absent authority to use Cash Collateral, the Debtor, its creditors and estate generally will suffer irreparable harm because the Debtor would immediately cease operations, which, in turn, would cause an immediate and pronounced deterioration in the value of the Debtor's business. Thus, the Debtor's access to Cash Collateral is absolutely necessary to preserve and maximize value for the benefit of all of the Debtor's stakeholders.

67.    In conjunction with this request to use Cash Collateral, the Debtor has formulated the budget attached to the Interim Order (the "Budget").  The Debtor believes that the Budget will provide the Debtor with adequate liquidity.  The interim Budget contains line items for each category of cash flows anticipated to be received or disbursed during the time period for which the Budget is prepared.   I believe that the Budget includes all reasonable, necessary, and

foreseeable expenses to be incurred in connection with the operation of the Debtor's business for the period set forth in the Budget.

68.    Moreover, the Interim Order was negotiated in good faith, and its terms and conditions are reasonable under the circumstances.    The proposed Interim Order provides Prepetition Secured Lenders with more than sufficient adequate protection to protect them from any diminution in value of their interests in the Prepetition Collateral during the pendency of this chapter 11 case.    The Debtor intends to provide the Prepetition Secured Lenders with adequate protection, which includes: (a) allowed superpriority administrative claims pursuant to section 507(b) of the Bankruptcy Code; (b) replacement liens on all property of the Debtor (excluding any avoidance actions under chapter 5 of the Bankruptcy Code) and all products, proceeds, rents, issues and profits thereof; (c) adherence to a budget; (d) maintenance of the Replacement Lien Collateral; and (e) maintenance of certain insurance.

69.    The proposed adequate protection package is more than sufficient under the circumstances of this case, where the Debtor's budget shows that the Debtor will remain cash flow positive and the Debtor had unused availability of approximately $1.8 million under its senior Credit Facility as of the Petition Date.    Moreover, the replacement liens being granted to the Prepetition Senior Lender cover collateral not included in its prepetition collateral package.

70.    Accordingly, I believe that the Prepetition Secured Lenders' interests in the Cash Collateral will be adequately protected.

24

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: March 14, 2016                          Respectfully submitted,

                                               */s/ Sam Joumblat*
                                               Sam Joumblat
                                               Chief Financial Officer
                                               Premium Transportation Services, Inc.

9910294.5