# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: ) | Chapter 11 |
| ) | |
| PREMIUM TRANSPORTATION SERVICES, INC., ) | Case No. 16-10629 (KJC) |
| d/b/a Total Transportation Services, ) | |
| ) | |
| Debtor[1] ) | |
| ) | **Re: D.I. 6, 32, 33, 41, 45** |

## SUPPLEMENTAL DECLARATION OF SAM JOUMBLAT
## IN SUPPORT OF ADDITIONAL PRELIMINARY MOTIONS

I, Sam Joumblat, hereby declare under penalty of perjury:

1. I submit this declaration to supplement my initial declaration in support of first day motions (D.I. 8) (the "Initial Declaration") and in support of the Additional Preliminary Motions (as defined below). The Initial Declaration is incorporated by reference herein.

2. As the Debtor's Chief Financial Officer, I am generally familiar with the Debtor's day to day operations, business and financial affairs, and books and records. Except as otherwise indicated herein, all facts set forth in this declaration are based on my personal knowledge of the Debtor's operations and finances, information gathered from my review of relevant documents, or information supplied to me by other members of the Debtor's management and the Debtor's advisors. I am over the age of 18 and am authorized to submit this declaration on behalf of the Debtor. If called upon to testify, I could and would testify competently to the facts set forth herein.

3. On March 14, 2016, the Debtor filed certain initial "first day" motions (D.I. 4, 5, 6, 7) (collectively, the "First Day Motions"), including a motion to authorize the use of cash

---

[1] The Debtor in this chapter 11 case, along with the last four digits of the Debtor's federal tax identification number, is: Premium Transportation Services, Inc. (3417). The Debtor's corporate headquarters is located at 18735 South Ferris Place, Rancho Dominguez, California 90220.

collateral and provide certain adequate protection. The Court held a hearing on the First Day Motions on March 15, 2016 and thereafter entered certain interim orders approving the First Day Motions (D.I. 17, 18, 19, 20), including an interim order permitting the use of cash collateral and providing certain adequate protection (the "Interim Cash Collateral Order") (D.I. 19). On March 17-18, the Debtor filed the following motions (collectively, the "Additional Preliminary Motions"):[2]

1) Motion of Debtor for Entry of an Order Pursuant to Bankruptcy Rule 1007 and Local Rule 1007-1(b) Extending the Time to File Schedules of Assets and Liabilities and Statement of Financial Affairs (D.I. 32) (the "Schedules and Statements Motion");

2) Debtor's Motion Pursuant to Bankruptcy Code Sections 105(a) and 366 for Interim and Final Orders: (I) Prohibiting Utilities from Altering, Refusing or Discontinuing Services; (II) Deeming Utility Companies Adequately Assured of Future Performance; and (III) Establishing Procedures for Determining Adequate Assurance of Payment; and (B) Motion of Debtor for Entry of an Order Pursuant to Bankruptcy Rule 1007 and Local Rule 1007-1(b) Extending the Time to File Schedules of Assets and Liabilities and Statement of Financial Affairs (D.I. 33) (the "Utilities Motion");

3) Debtor's Application for Entry of an Order Pursuant to 28 U.S.C. § 156(c) Approving the Retention and Appointment of Epiq Bankruptcy Solutions, LLC as Claims and noticing Agent for the Debtor, Effective as of March 17, 2016 (D.I. 41) (the "Epiq Application"); and

4) Debtor's Motion for Order Under Sections 105(a), 363(b), 507(a) and 541 of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004 for Interim and Final Orders Authorizing Payment of Certain Prepetition Taxes (D.I. 45) (the "Tax Motion").

4. The Debtor filed the Additional Preliminary Motions to enable the Debtor to operate with minimal disruption during the pendency of the chapter 11 case and to permit the Debtor a breathing period to consider options. I am familiar with the contents of each of the Additional Preliminary Motions and I believe that the relief sought in the Additional Preliminary

---

[2] Capitalized terms, to the extent not defined herein, have the meanings ascribed to them in the applicable Additional Preliminary Motions.

Motions is necessary to permit an effective transition into chapter 11. I further believe that the relief requested in the Additional Preliminary Motions will preserve and maximize the value of the Debtor's estate and assist the Debtor in achieving an expeditious, successful reorganization.

5. The Debtor believes, and I agree, that the Debtor has satisfied the applicable standards for the relief requested in each of the Additional Preliminary Motions, and that the Court's grant of the requested relief is in the best interests of the Debtor's estate, its creditors, and all other parties in interest. Accordingly, on behalf of the Debtor, I respectfully submit that the Additional Preliminary Motions should be approved. A description of the relief requested and the facts supporting each of the Additional Preliminary Motions is set forth below.

**I.    Schedules and Statements Motion.**

6. **Relief Requested.** By this Motion, the Debtor seeks entry of an order extending the time within which it is required to file its schedules of assets and liabilities, schedules of current income and expenditures, schedules of executory contracts and unexpired leases (collectively, the "Schedules") and statements of financial affairs (the "Statements") to sixty (60) days after the Petition Date, through and including Thursday, May 12, 2016.

7. The Debtor is requesting a thirty day extension of the Schedules and Statements deadline to permit the Debtor sufficient time to gather, analyze and format the information necessary for Schedules and Statements. Given the more critical and weighty matters that the Debtor's limited staff must address in the early days of this chapter 11 case, the Debtor will not be in a position to complete the Schedules and Statements without the extension. Completing the Schedules and Statements for the Debtor will require significant collection, review and assembly of information. Nevertheless, recognizing the importance of the Schedules and Statements in this chapter 11 case, the Debtor intends to complete the Schedules and Statements as quickly as

3

possible under the circumstances. Accordingly, on behalf of the Debtor, I respectfully submit that a 30-day extension of time to file the Schedules and Statements is necessary and appropriate.

## II. Utilities Motion.

8. **Relief Requested.** By this Motion, the Debtor seeks entry of interim and final orders (i) prohibiting Utility Companies (as defined below) from altering, refusing, discontinuing services or discriminating against the Debtor solely on the basis of the commencement of this case or that the Debtor did not pay a debt when due prepetition; (ii) deeming Utility Companies adequately assured of future performance; and (iii) establishing procedures for determining adequate assurance of payment.

9. The Debtor maintains accounts with utility providers (collectively, the "Utility Companies") for various utility services (collectively, the "Utility Services"), including internet, videoconferencing, waste disposal and telecommunications services and similar utility products and services. Prior to the Petition Date, the Utility Companies provided Utility Services to the Debtor at various locations. Ordinarily, depending on the underlying agreements, the Debtor pays the Utility Companies upon receipt of weekly, semi-monthly or monthly invoices for the Utility Services. In general, the Debtor has established a good payment history with virtually all of the Utility Companies and has made payments on a regular and timely basis. To the best of the Debtor's knowledge there are no material defaults or arrearages of any significance with respect to the Debtor's undisputed Utility Services invoices. On average, prior to the Petition Date, the Debtor spent approximately $12,000 each month on account of Utility Services.

10. The Debtor expects that revenues from operations and its use of cash collateral pursuant to the *Interim Order (I) Authorizing Use of Cash Collateral, (II) Granting Adequate Protection and (III) Granting Related Relief* (D.I. 19) and any further interim or final cash

collateral order entered by the Court, will be sufficient to pay all postpetition obligations for Utility Services, and intends to continue to pay all such obligations in a timely manner. As an additional measure, the Debtor proposes to deposit, no later than ten (10) business days after entry of the interim order, a sum equal to approximately fifty percent (50%) of its average aggregate monthly payments for Utility Services based on invoices received from Utility Companies immediately before the Petition Date (approximately $6,000), into a segregated, interest-bearing account to provide adequate assurance of payment for future services to the Utility Companies. The Debtor submits that the Utility Deposit Account and deposits already held by utilities, if any, together with the Debtor's ability to pay for future Utility Services in the ordinary course of business (collectively, the "Proposed Adequate Assurance"), constitutes sufficient adequate assurance to the Utility Companies. If any Utility Company believes additional assurance ("Additional Assurance") is required, the Debtor proposes that such Utility Company be required to request such Additional Assurance pursuant to the procedures set forth in the Utilities Motion.

11.    Uninterrupted Utility Services are essential to the Debtor's continued operations. If any Utility Company altered, refused or discontinued service, even for a brief period, the Debtor's businesses could be severely disrupted, jeopardizing the Debtor's reorganization efforts. Access to utility services is critical to the Debtor's ongoing operations while it explores its strategic options. Should any Utility Company refuse or discontinue a utility service even for a brief period of time, the Debtor's operations and administrative functions would be severely disrupted. Certain Utility Companies provide the Debtor with services necessary to run its day-to-day office operations. Further, the Debtor is dependent upon internet and telephone service to maintain its ability to send and receive electronic communications and records. In this regard, I

believe it is in the best interest of the Debtor, its estate, and creditors to maintain continuous and uninterrupted Utility Services during this case.

12.     Moreover, without the Additional Assurance Procedures, the Debtor could be forced to address numerous requests by Utility Companies in an unorganized manner at a critical period in its chapter 11 case when its efforts should be focused on stabilizing its operations and maximizing value for all its stakeholders.  The orderly process contemplated by the Additional Assurance Procedures is critical to the Debtor's smooth transition into chapter 11 and will aid in its reorganization efforts.  The Additional Assurance Procedures will further ensure that all parties act in good faith by establishing a fair process.  This will protect the Debtor and its stakeholders from any attempt by a Utility Company to delay a request for adequate assurance in an attempt to force the Debtor to accede to its request to avoid cessation of essential services.

### III.    Epiq Application

13.     **Relief Requested.**  By this Application, the Debtor respectfully requests the entry of an order authorizing them to retain and employ Epiq Bankruptcy Solutions, LLC ("Epiq") as Claims and Noticing Agent in this chapter 11 case as of the Petition Date, to, among other things: (a) serve as the Court's noticing agent to mail notices to the estate's creditors and parties in interest; (b) prepare and serve required notices in this case; (c) maintain an official copy of the Debtor's schedules of assets and liabilities and statements of financial affairs; (d) maintain a list of all potential creditors and other mailings lists; (e)  maintain a post office box or address for the purpose of receiving claims and returned mail, and process all mail received; (f) process all proofs of claim received; (g) maintain the official claims register; (h) record all transfers of claims and providing required notices of the same; and (i) other matters as set forth in the Application.  The Debtor proposes to retain Epiq on the terms and conditions set forth in an agreement substantially in the form attached to the Epiq Application as an exhibit and

incorporated therein by reference (the "Services Agreement"). The Services Agreement does provide for the payment of a $15,000 retainer upon approval of the Epiq Application. Epiq was unwilling to provide services without such retainer and the Debtor determined that payment of such retainer was an acceptable term of Epiq's engagement.

14. Pursuant to Bankruptcy Code section 156(c), this Court is authorized to use facilities other than the Clerk's Office for the administration of bankruptcy cases, including such matters as giving notice of hearings and orders filed in this chapter 11 case, the meeting of creditors pursuant to section 341 of the Bankruptcy Code and claims bar dates, and providing record keeping and claims docketing assistance.

15. In addition, under Bankruptcy Rule 2002(f), the Court may direct that a person other than the Clerk of the Court give notice of the various matters described therein. Moreover, Local Rule 2002-1(f) requires a debtor to file an application to retain a notice and/or claims clerk within seven (7) days of the Petition Date in all cases with more than 200 creditors. The Debtor believes that the number of creditors in this case will exceed that number. Thus, pursuant to Local Rule 2002-1(f) and for the reasons set forth below, the Debtor believes it is necessary and in the best interests of its creditors and estate to engage Epiq to act as an outside agent to the Clerk's Office in order to assume full responsibility for, among other things, distribution of notices and proof of claim forms and the maintenance, secondary processing and docketing of all proofs of claim filed in the Debtor's case.

16. The Debtor anticipates that there will be hundreds of entities that the Debtor will be required to serve with the various notices, pleadings, and other documents filed in this case. In consideration of the number of anticipated claimants and other parties-in-interest, the Debtor

respectfully submits that the appointment of Epiq will expedite the distribution of notices and relieve the Clerk's Office of the administrative burden of processing such notices.

17. Consistent with the Protocol for the Employment of Claims and Noticing Agents under 28 U.S.C. § 156(c) of the United States Bankruptcy Court for the District of District of Delaware, the Debtor obtained and reviewed engagement proposals from three (3) other Court-approved claims and noticing agents to ensure selection through a competitive process.

18. For all of the foregoing reasons, I believe that the appointment of Epiq as the Claims and Noticing Agent is in the best interests of the Debtor, its estate, its creditors and other parties in interest.

**IV.  Taxes Motion.**

19. **Relief Requested.**  By this Motion, the Debtor seeks the entry of an Order (i) authorizing, but not directing, the Debtor to pay all prepetition taxes (the "Taxes") that the Debtor, in its discretion, deem necessary to various federal, state, county and city taxing authorities (collectively, the "Taxing Authorities"); (ii) authorizing and directing banks and other financial institutions to receive, process, honor and pay all checks presented for payment and electronic payment requests related to the foregoing; and (iii) granting related relief.

20. In the ordinary course of its business, the Debtor pays Taxes to various Taxing Authorities throughout the United States on a periodic basis.  While the Debtor believes that it is substantially current with respect to its payment of Taxes, the Debtor seeks to make such payments where (a) Taxes accrued or incurred prepetition were not paid prepetition or were paid in an amount less than actually owed, (b) payments made prepetition by the Debtor were lost or otherwise not received in full by any of the Taxing Authorities, or (c) Taxes incurred for prepetition periods become due after the commencement of this case.  As of the Petition Date,

the Debtor's outstanding obligations in respect of Taxes, including amounts incurred for prepetition periods that will come due after the Petition Date, totaled approximately $4,000.

21. Payment of the Taxes is necessary for the Debtor to remain in good standing and operate in the various jurisdictions in which it does business. Certain Taxing Authorities either have not been paid due to the time during the month, quarter or year at which such Taxes are normally remitted, or may have been sent checks for Taxes that may or may not have been presented or cleared as of the Petition Date. In addition, prior to the Petition Date, the Debtor made payments to certain Taxing Authorities, yet the Taxing Authorities are currently reviewing those payments and may determine that the Debtor owes additional amounts. In other cases, obligations may have accrued or are accruing, or are subject to audit or review, but may have not yet become due and payable. Accordingly, the Debtor seeks authorization for its bank to honor prepetition wire transfer requests and checks issued by the Debtor to the Taxing Authorities in payment of prepetition Taxes as described herein that, as of the Petition Date, have not cleared or been transferred. In addition, to the extent that the Debtor has not yet remitted payment to the Taxing Authorities with respect to certain prepetition Taxes, the Debtor seeks authorization to issue checks or provide for other means of payment to the Taxing Authorities to the extent necessary to pay such Taxes.

22. Many federal, state and local Taxing Authorities impose personal liability on directors and/or responsible officers of entities responsible for collecting or paying certain taxes to the extent that such taxes are not remitted. Thus, if certain of the Taxes remain unpaid, the Debtor's directors and responsible officers may be subject to lawsuits or even criminal prosecution on account of such nonpayment during the pendency of this case. Such lawsuits or proceedings would create a significant distraction for the Debtor's directors and responsible

officers at a time when they should be focused on exploring the Debtor's strategic options to maximize the value of the Debtor's business and assets. Moreover, by paying legitimate tax claims now, the Debtor will avoid any unnecessary fees, interest or penalties that might otherwise accrue. For these reasons, I believe it is in the Debtor's best interests to be permitted to pay the Taxes as deemed necessary in the Debtor's discretion.

**V.     Further Extension of Interim Cash Collateral Order.**

23.   **Relief Requested.**  The Debtor is seeking entry of a further interim order (the "Interim Order"): (i) authorizing its use of the Prepetition Secured Lenders' Cash Collateral, on an interim basis and (ii) scheduling a further hearing ("Final Hearing") to consider the Debtor's use of the Prepetition Secured Lenders' Cash Collateral following the Termination Date and the entry of a final order authorizing the use of any Cash Collateral on a permanent basis as will be set forth in a subsequently proposed order.

24.   **Risk of Irreparable Harm and Need for Immediate Relief.**  The orderly continuation of the Debtor's operations and the preservation of its going concern value is largely dependent upon its ability to regularly convert Prepetition Collateral into Cash Collateral and use it to support the Debtor's business operations. Among other things, Cash Collateral will be used to fund the Debtor's payments to vendors and employees and to satisfy ordinary costs of operation, including rent, taxes and insurance. Without such access to liquidity, the Debtor's ability to navigate through the chapter 11 process will be jeopardized, to the detriment of the Prepetition Secured Lenders and all of the estate's other stakeholders. As a result, the Debtor has an immediate need to use Cash Collateral to ensure sufficient liquidity throughout the pendency of this chapter 11 case.

25. Absent authority to use Cash Collateral, the Debtor, its creditors and estate generally will suffer irreparable harm because the Debtor would immediately cease operations, which, in turn, would cause an immediate and pronounced deterioration in the value of the Debtor's business. Thus, the Debtor's access to Cash Collateral is absolutely necessary to preserve and maximize value for the benefit of all of the Debtor's stakeholders.

26. In conjunction with this request to use Cash Collateral, the Debtor has formulated a further budget attached to the Interim Order (the "Budget"). The Debtor believes that the Budget will provide the Debtor with adequate liquidity. The interim Budget contains line items for each category of cash flows anticipated to be received or disbursed during the time period for which the Budget is prepared. I believe that the Budget includes all reasonable, necessary, and foreseeable expenses to be incurred in connection with the operation of the Debtor's business for the period set forth in the Budget.

27. Moreover, the Interim Order was negotiated in good faith, and its terms and conditions are reasonable under the circumstances. The proposed Interim Order provides Prepetition Secured Lenders with more than sufficient adequate protection to protect them from any diminution in value of their interests in the Prepetition Collateral during the pendency of this chapter 11 case. The Debtor intends to provide the Prepetition Secured Lenders with adequate protection, which includes: (a) allowed superpriority administrative claims pursuant to section 507(b) of the Bankruptcy Code; (b) replacement liens on all property of the Debtor (excluding any avoidance actions under chapter 5 of the Bankruptcy Code) and all products, proceeds, rents, issues and profits thereof; (c) adherence to a budget; (d) maintenance of the Replacement Lien Collateral; and (e) maintenance of certain insurance.

28. The proposed adequate protection package is more than sufficient under the circumstances of this case, where the Debtor's budget shows that the Debtor will maintain a positive cash balance and the Debtor had unused availability of approximately $1.8 million under its senior Credit Facility as of the Petition Date. Moreover, the replacement liens being granted to the Prepetition Senior Lender cover collateral not included in its prepetition collateral package.

29. Accordingly, I believe that the Prepetition Secured Lenders' interests in the Cash Collateral will be adequately protected.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: March 22, 2016                                Respectfully submitted,

                                                     */s/ Sam Joumblat*
                                                     Sam Joumblat
                                                     Chief Financial Officer
                                                     Premium Transportation Services, Inc.

9923217.2